**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Arthur BARNES, Defendant–Appellant.**

No. 96–2303.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 22, 1996.

Decided June 11, 1997.

Tina L. Nommay, Robert N. Trgovich (argued), Office of the United States Attorney, Fort Wayne, IN, for Plaintiff-Appellee.

Donald C. Swanson, Jr., Matthew J. Rentschler (argued), Swanson & Campbell, Fort Wayne, IN, for Defendant-Appellant.

Before BAUER, ESCHBACH and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

Arthur Barnes was convicted before a jury in the United States District Court for the Northern District of Indiana on four counts of unlawfully acquiring and redeeming food stamps, in violation of 7 U.S.C. § 2024(b) and (c). The district court thereafter sentenced Barnes to eighty-seven months imprisonment. We affirm.

## I. BACKGROUND

### A. *Factual Background*

Arthur Barnes ("Barnes" or "Arthur") owned and operated two small grocery stores in Fort Wayne, Indiana. The U.S. Department of Agriculture ("D.O.A.") authorized both stores, Barnes Grocery and Family Market,[1] to accept food stamp coupons as payment for specified grocery items pursuant to the federal government's Food Stamp Program.[2] As an authorized retailer, Barnes

---

1. Barnes Grocery and Family Market were authorized to participate in the Food Stamp Program on April 16, 1981, and May 12, 1987, respectively.

2. For purposes of the Food Stamp Program, "food" generally means "any food product for home consumption except alcoholic beverages, tobacco, and hot foods or hot food products

was entitled to receive full value credit for any food stamps he legally received upon submitting them, together with a completed redemption certificate, to his local bank. By doing so, he effectively warranted that the food coupons redeemed were accepted in accordance with Food Stamp Program regulations. During 1992, Barnes personally redeemed $1,000,412.00 of food stamp coupons on behalf of Barnes Grocery and Family Market. That same year, the two stores' combined actual sales totalled a mere $343,697.00. From 1987 to 1994,[3] Barnes redeemed $3,524,754.00 of food stamp coupons to his bank and, in turn, the government, despite the fact that his two stores' operations generated only $1,283,232.00 in gross sales throughout that seven-year period.

While working at Family Market on October 27, 1993, and November 1, 1993, Barnes himself purchased, at an "exchange rate" of sixty-seven percent, $420.00 and $500.00 of pre-designated food stamps for $280.00 and $334.00 in cash, respectively, from an undercover D.O.A. agent. On four other occasions, six of Barnes' employees, including his brother, Philip Barnes ("Philip"), also purchased pre-designated food stamp coupons from undercover D.O.A. agents. The D.O.A. was able to recover most of the coupons after they had been redeemed through Barnes' bank.

On June 23, 1994, Philip voluntarily informed a D.O.A. agent, one Brian Crow, that Barnes had instructed him, as well as his co-employees, LaTonya Armstrong, Henry Armstrong, George Barnes, Leon Sullivan and Seth Townsend, to purchase food stamps for cash at a rate of $0.67 on the dollar. Philip also explained to Crow that Barnes usually deposited coupons into the Barnes Grocery and Family Market bank accounts so that cash would be available to fuel future food stamp purchases. A 1992 audit of Barnes' banking activity revealed that ninety-five percent of his total deposits for that year consisted of food stamp coupons.

### B. *Procedural Background*

The Government filed an Indictment on October 26, 1994, charging Barnes with two counts of knowingly acquiring food stamp coupons through unauthorized means in violation of 7 U.S.C. § 2024(b), and two counts of redeeming food stamp coupons knowing the same to have been unlawfully procured in violation of 7 U.S.C. § 2024(c). Specifically, Counts I and II stemmed from the two occasions upon which Barnes personally exchanged food stamp coupons for cash with D.O.A. agents, whereas Counts III and IV related to the vast discrepancy between food stamp redemptions and gross sales figures for Barnes Grocery and Family Market during 1992. After a two-day trial commencing March 20, 1995, a jury found Barnes guilty on all four counts of the Indictment. He subsequently filed a Motion for Judgment of Acquittal After Verdict of Guilty; and in the Alternative Motion for New Trial, which the district court denied.

On March 25, 1996, the district court sentenced Barnes to eighty-seven months imprisonment, having enhanced his punishment by seventeen levels pursuant to sections 2F1.1 and 3B1.1 of the United States Sentencing Guidelines ("U.S.S.G."). Thirteen of those levels were attributable to the fact that Barnes' violation of 7 U.S.C. § 2024(b)(1) resulted in a "loss" exceeding $2,500,000.00, with the remaining four levels added for his role as a leader or organizer of criminal activity involving five or more individuals.

### II. ISSUES

Barnes presents this court with three issues of consideration on appeal. First, he argues that the district court erroneously denied his Motion for Judgment of Acquittal on Counts III and IV of the Indictment because the Government proffered

insufficient evidence to prove that he "knowingly" redeemed illegally-obtained food stamp coupons in violation of 7 U.S.C. § 2024(b). Second, Barnes asserts that the sentencing court's imposition of a thirteen level sentence enhancement under U.S.S.G

---

ready for immediate consumption." 7 U.S.C § 2012(g).

**3.** Excluding 1992.

§ 2F1.1 was improper because the figures used to calculate "loss" were unreliable, and even if such were not the case, that "loss" was overstated by sixty-seven percent. Finally, he contests the four level U.S.S.G. § 3B1.1 sentence enhancement for his "leadership" role in the offense. With his appeal grounded in issues arising under Counts III and IV of the Indictment issued against him, it warrants noting that Barnes does not dispute the jury's determination that on two separate occasions he personally exchanged food stamp coupons with D.O.A. agents for cash.

## III. DISCUSSION

### A. *Sufficiency of Evidence as to Counts III and IV*

■ The federal statute governing food stamp fraud, as contained in Counts III and IV of the Indictment returned against Barnes, provides that "whoever *knowingly* uses, transfers, acquires, alters, or possesses coupons or authorization cards in any manner not authorized by [the statute] or the regulations" is subject to a fine and imprisonment. 7 U.S.C. § 2024(b)(1) (emphasis added).[4] An "unauthorized" manner of transferring or acquiring food stamp coupons within the meaning of the statute is one wherein such coupons are not used to "purchase food in retail food stores ... at prices prevailing in such stores." 7 U.S.C. § 2016(b). On appeal, Barnes does not ques-

tion whether the *actus reus* component of § 2024(b)(1) is presently satisfied; it is beyond dispute that his employees "transfer[red or] acquire[d] ... coupons in [a] manner not authorized by [the statute] or regulations." Rather, he submits that the only evidence which the Government presented with regard to its charges in Counts III and IV—the vast discrepancy between actual food stamp redemptions and gross sales figures—was insufficient to establish his *mens rea* of "knowledge" as required by 7 U.S.C. § 2024(b)(1).[5] In doing so, he characterizes the inference drawn between such evidence and his state of mind as "an unwarranted leap of faith in the Government's case."

"In challenging the sufficiency of the evidence to support [a] conviction, [Barnes] bears a heavy burden." *United States v. Hill*, 40 F.3d 164, 166 (7th Cir.1994), *cert. denied*, 514 U.S. 1029, 115 S.Ct. 1385, 131 L.Ed.2d 238 (1995). Indeed, as this court has reiterated time and again, "[w]hen reviewing challenges to sufficiency of evidence supporting a conviction we consider the evidence at trial in the light most favorable to the government; if we conclude that any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt, we will reject the defendant's sufficiency challenge." *United States v. Hatchett*, 31 F.3d 1411, 1416 (7th Cir.1994) (citations and quotations omitted). This deferential standard looms as a

---

4. The "food stamp fraud" statute, 7 U.S.C. § 2024(b)(1), reads, in relevant part:

[W]hoever knowingly uses, transfers, acquires, alters, or possesses coupons or authorization cards in any manner not authorized by this chapter or the regulations issued pursuant to this chapter shall, if such coupons or authorization cards are of a value of $100 or more, be guilty of a felony and shall, upon the first conviction thereof, be fined not more than $10,000 or imprisoned for not more than five years, or both, and, upon the second and any subsequent conviction thereof, shall be imprisoned for not less than six months nor more than five years and may also be fined not more than $10,000 or, if such coupons or authorization cards are of a value of less than $100, shall be guilty of a misdemeanor, and, upon the first conviction thereof, shall be fined not more than $1,000 or imprisoned for not more than one year, or both, and upon the second

and any subsequent conviction thereof, shall be imprisoned for not more than one year and may also be fined not more than $1,000. In addition to such penalties, any person convicted of a felony or misdemeanor violation under this subsection may be suspended by the court from participation in the food stamp program for an additional period of up to eighteen months consecutive to that period of suspension mandated by section 2015(b)(1) of this title.

5. Barnes contends that an alleged unreliability of the data used to calculate "gross sales" for purposes of use in the Government's "loss" formula, discussed *infra*, somehow affects his conviction under 7 U.S.C. § 2024. We fail to see how this argument poses any relevance whatsoever to the present issue: whether Barnes knowingly used, transferred, acquired, altered or possessed food stamp coupons in an unauthorized manner. Thus, we decline to address its merits.

difficult obstacle for Barnes to overcome. *United States v. Alcantar,* 83 F.3d 185, 189 (7th Cir.1996).

At trial, the Government carried, and a jury deemed it to have satisfied, the burden of proving beyond a reasonable doubt that Barnes "knowingly" acquired and redeemed food stamps having a value of more than $100.00, in a manner not authorized by statute or regulation. 7 U.S.C. § 2024(b) (1993); *see Liparota v. United States,* 471 U.S. 419, 422, 105 S.Ct. 2084, 2086, 85 L.Ed.2d 434 (1985); *United States v. Abdelkoui,* 19 F.3d 1178 (7th Cir.1994). As explained above, Barnes primarily asserts that the government presented insufficient evidence to establish that he possessed the requisite mens rea to have committed food stamp fraud, and therefore, the district court improperly denied his Motion of Acquittal on Counts III and IV. In considering his argument, we are mindful that the Government does not bear an unduly heavy burden when prosecuting alleged violators of § 2024(b)(1). *Liparota,* 471 U.S. at 434, 105 S.Ct. at 2092. It need not introduce any extraordinary evidence that would conclusively demonstrate Barnes' state of mind. *Id.* "Rather, as in any other criminal prosecution requiring *mens rea,* the Government may prove by reference to the *facts and circumstances surrounding the case that [Barnes] knew his conduct was unauthorized or illegal.*" *Id.* (emphasis added).

We are of the opinion that when considering the totality of all the facts and circumstances surrounding this case, we are only left to conclude that Barnes knew his employees at Family Market and Barnes Grocery were acquiring food stamps illegally, and as such, it was not improper for the district court to have denied his Motion of Acquittal. On four different occasions, various Family Market and Barnes Grocery employees exchanged cash for food stamps with undercover agents. Barnes' own brother, Philip, explained to a D.O.A. agent that Barnes had instructed him, as well as his co-employees, to purchase food stamps at a rate of $0.67 on the dollar. Tellingly, on October 27, 1993, and November 1, 1993, Barnes had personally exchanged cash for food stamps with undercover D.O.A. agents at a rate of exactly sixty-seven percent. Barnes also personally signed all food stamp redemption certificates submitted to his local bank on behalf of Barnes Grocery and Family Market, kept a ledger of transactions for accounting purposes, and *knew* that a $652,706.00 discrepancy existed between food stamp redemptions and gross sales during 1992. Moreover, he had read and understood the Food Stamp Program's regulations prohibiting, among other things, "trading cash for food stamps," as well as trained his employees about how the Program worked. In short, every bit of factual and circumstantial evidence in this case suggests that Barnes knew his employees were exchanging food stamp coupons for cash. Virtually all that lacks is Barnes' admission of his knowledge. And it would be a fruitless exercise to debate the otherwise outlandish proposition that a defendant's admission is necessary to obtain a conviction in cases of this sort. Insofar as it was unnecessary to have introduced extraordinary evidence conclusively demonstrating Barnes' state of mind, *Liparota,* 471 U.S. at 434, 105 S.Ct. at 2092, the "leap of faith" that Barnes suggests the Government was forced to make between the facts of this case and the inferences drawn from those facts is not a broad one. We are convinced that any rational trier of fact, faced with the abundance of direct and circumstantial evidence in this case, would conclude that Barnes did, in fact, have the requisite *mens rea* to commit food stamp fraud.

### B. Sentencing

Barnes' alternative basis for appeal is that the district court clearly erred in enhancing his sentence by seventeen levels pursuant to sections 2F1.1 and 3B1.1 of the United States Sentencing Guidelines ("U.S.S.G."). Thirteen of those levels were attributable to the fact that Barnes' violation of 7 U.S.C. § 2024(b)(1) resulted in a "loss" exceeding $2,500,000.00, with the remaining four levels added for his role as a leader of criminal activity involving five or more individuals. We shall consider Barnes' arguments, in turn, only to conclude that the district court properly applied the U.S.S.G. and did not

commit clear error by adding seventeen levels to his base offense.

### 1. *Calculation of "Loss"*

Under U.S.S.G. § 2F1.1(b)(1), a district court may increase the sentence of one who has violated 7 U.S.C. § 2024(b)(1) by thirteen levels if such offense resulted in a "loss" exceeding $2,500,000.00. "For purposes of [sec. 2F1.1(b)(1) ], the loss need not be determined with precision." U.S.S.G. § 2F1.1, Application Note 8. Rather, "[t]he [sentencing] court need only make a reasonable estimate of the loss, given the available information." *Id.* Moreover, a court is not limited to making sentencing enhancements only for those losses incurred during the commission of the offense of conviction, but may also impose them for losses arising from "the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2).[6]

■ In the present case, the Government offered evidence regarding the actual food sales and food stamp redemptions of Barnes' two grocery stores for the years 1987 through 1994.[7] It then submitted to the trial court a straightforward formula for calculating "loss" under U.S.S.G. § 2F1.1(b)(1). Simply stated, the Government argued that "loss" equated to Barnes Grocery's and Family Market's aggregated food stamp redemptions, less actual food sales. The district court, after noting that Barnes "present[ed] no other formula for calculating the amount of the loss," *United States v. Barnes*, No. 1:94–CR–44 at 10 (March 25, 1996), found that "the formula used by the government to

calculate the amount of loss . . . results in a logical and reasonable estimate of that loss." *Id.* Using the Government's methodology and data, the court then determined that Barnes' two stores collectively redeemed $2,974,444.00 [8] more in food stamps than they actually sold in food from 1987 through 1994, and thus held "that the government . . . established by a preponderance of the evidence that the amount of the loss in this case totals more than $2,500,000, and that the base offense level should be increased by 13, pursuant to U.S.S.G. § 2F1.1." *Id.* at 11. On appeal, Barnes contends that these calculations are faulty, unreliable and do not purport to measure loss. While we review the district court's calculation of the amount of loss associated with Barnes' offense under § 2F1.1(b)(1) for clear error, *United States v. Yusufu*, 63 F.3d 505, 513 (7th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 578, 133 L.Ed.2d 501 (1995); *United States v. Loscalzo*, 18 F.3d 374, 386 (7th Cir.1994), our consideration of the district court's meaning of "loss" falls subject to *de novo* scrutiny. *Yusufu*, 63 F.3d at 513.

### a. *Meaning of "Loss"*

■ As a preliminary matter, we recognize that this court has never determined the appropriate definition of "loss" in the context of a conviction under 7 U.S.C. § 2024. *But see United States v. Scott*, 929 F.2d 313, 315 n. 2 (7th Cir.1991) (addressing "loss" in food stamp fraud case without defining the term). Section 2F1.1, Application Note 7 of the U.S.S.G. initially directs us to consider § 2B1.1, Application Note 2, which reads,

---

**6.** U.S.S.G § 1B1.3(a)(2) reads, in relevant part:

[A]djustments . . . shall be determined on the basis of . . . all acts and omissions described in [sec. 1B1.3(a)(1)(A) ] . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction.

U.S.S.G. § 1B1.3(a)(1)(A) provides:

[A]djustments . . . shall be determined on the basis of . . . all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

**7.** Although Counts III and IV of the Indictment only charged Barnes for the illegal food stamps transactions occurring in 1992, his sentence was enhanced for 1987–1994 conduct that was related to the offense of conviction. *See* U.S.S.G. § 1B1.3(a)(2). Barnes does not question the applicability of this sentencing provision to his case.

**8.** The Government points out in its Brief that the amount of "loss" should have been $2,975,817.00, and that such error on the sentencing judge's behalf was the result of the Government's own miscalculation. The error, however, does not change the applicable level of sentencing enhancement in this case.

" 'loss' [is] the value of the property taken, damaged, or destroyed." Both Barnes and the Government seem to suggest that this is the proper measure of "loss" for purposes of sentencing enhancement in food stamp fraud cases such as this one. However, § 2F1.1 goes on to note that "there are ... instances where additional factors are to be considered in determining the loss....*In a case involving diversion of government program benefits, loss is the value of the benefits diverted from intended recipients or uses.*" U.S.S.G § 2F1.1, Application Note 7(d) (emphasis added). Every circuit that has heretofore conclusively addressed the applicable valuation of "loss" pursuant to a 7 U.S.C. § 2024(b) conviction has endorsed this more specific definition embodied in Application Note 7(d), and we find no reason to disagree with them. *See United States v. Caba*, No. 96–1069(L), 1996 WL 685764 (2d Cir. Nov.29, 1996); *United States v. Cooper*, No. 95–50435, 1996 WL 478724 (9th Cir. June 4, 1996).

■ Barnes does not necessarily dispute the validity of the Government's formula vis-a-vis the U.S.S.G.'s definition of "loss." In other words, he does not contend that the methodology of subtracting food sales from Barnes Grocery's and Family Market's aggregated food stamp redemptions fails to capture "the value of the benefits diverted from recipients or uses." U.S.S.G. § 2F1.1, Application Note 7(d). Rather, Barnes argues that, assuming there existed a cash-for-food stamp coupon "exchange rate" of $0.67 on the dollar, it follows that he dispersed approximately two-thirds of the face value of all such coupons to their intended beneficiaries. His approach would result in a "loss" calculation of only $941,481.33,[9] justifying an eleven-level sentencing enhancement under § 2F1.1(b)(1). We think it clear that Barnes' reasoning misses the mark. Section 2F1.1, Application Note 7(d) makes plain that the definition of "loss" applicable herein is "the value of benefits from intended recipients or uses." True, as Barnes suggests, the Food Stamp Program's intended recipients did receive sixty-seven percent of their benefits

after he received his thirty-three percent "commission." What Barnes fails to recognize, however, is that his fraudulent scheme diverted a full one-hundred percent of the value of the food stamp coupons he purchased from their intended "use"—the purchase of specified food products from authorized retailers. In *Liparota v. United States*, 471 U.S. at 426, 105 S.Ct. at 2088, the Supreme Court explained:

> [Section] 2024(b)(1) declared it criminal to use, transfer, acquire, alter, or possess food stamps in any manner not authorized by statute or regulations. The statute provides further that "[c]oupons issued to eligible households shall be used by them only to purchase food in retail stores which have been approved for participation in the food stamp program *at prices prevailing in such stores.*" 7 U.S.C. § 2016(b) (emphasis added); *see also* 7 CFR § 274.10(a) (1985). This seems to be the *only* authorized use.

Indeed, food stamp coupons are dispersed to those less fortunate for the *sole* purpose of ensuring that every citizen of this nation receives sufficient nutrition to enjoy a healthy existence. The defendant's fraudulent actions in this case have not only frustrated that goal, but they have cost the American taxpayers countless thousands of dollars and, in turn, contributed to several of modern society's many ills. That is, it almost goes without saying that food stamp recipients sell their allotments to retailers like Barnes so that they might later be able to purchase products other than the approved food items. One can only speculate what such items would include—alcohol, drugs and the like. We are confident that these are not the uses the Food Stamp Act envisioned, and as such, we shall neither reduce the $2,974,-444.00 "loss" calculation by sixty-seven percent nor find "clear error" on the sentencing court's behalf.

### b. *Reliability of Data*

Barnes' second basis for contesting the district court's "loss" calculation lies in the *reliability* of the data actually "plugged in"

---

9. This value is derived from multiplying the result of the Government's formula, $2,974,444.00, by 33 percent (e.g., the amount of "commission" he retained on every illegal sale).

to the Government's formula, discussed *supra.* He contends that the gross sales figures used at sentencing, which had been taken from documents submitted to the Internal Revenue Service ("IRS"), were inaccurate to the extent that several of his employees had stolen from him by drawing checks "on [his] business" and, alternatively, it is unclear whether the food stamp transactions in which Barnes' employees participated had been reported or kept off the books.

■ As to Barnes' first argument, we fail to see how the employee theft alleged in this case "greatly weaken[s] the reliability of the gross sales figures." At trial, Barnes testified that, on one occasion, "somebody took some [pre-signed checks] and he posed as [Barnes] and went to the drive-up [at the bank] and cashed over 900 some dollars...." When several other attempts were made at such forgery, the bank simply refused to honor the checks submitted to it. Even if we assume, *arguendo,* that the $900.00 theft of which Barnes speaks is not *de minimis* relative to the $2,974,444.00 loss calculated by the district court, basic accounting principles lead us to conclude that the theft to which Barnes alludes has no impact whatsoever on the gross sales figures obtained from his IRS filings. That is, "gross sales," in the legal and financial sense of the term, is the "[t]otal of all sales at invoice prices, not reduced by discounts, allowances, returns, commissions, or other adjustments." Black's Law Dictionary, at 703 (6th Ed.1990). Thus, its value is derived from sales receipts. Returns and the like, *including expenses paid by check (whether forged or authentic), do not affect amount of "gross sales" reported to the IRS.* Barnes' argument in this regard is less than persuasive.

■ Barnes' second explanation for the discrepancy between gross sales and food stamp coupon redemptions is also faulted. He seems to contend that, if the cash-for-coupons transactions that his employees engaged in "were kept off the books," gross sales would have been understated, thereby overstating "loss" vis-a-vis the Government's formula. The logic of Barnes' argument flies in the face of what § 2F1.1 of the U.S.S.G. requires us to measure—the "value of the

benefits diverted from intended recipients or uses." U.S.S.G. § 2F1.1, Application Note 7(d). In effect, we seek to determine the difference between "legitimate" food sales under the Food Stamp Program (e.g., those involving "any food product for home consumption except alcoholic beverages, tobacco, and hot foods or hot food products ready for immediate consumption." 7 U.S.C § 2012(g)), and "illegitimate" ones. Had the employees of Family Market and Barnes Grocery actually recorded the illegal transactions at issue as sales, the Government's formula would be meaningless. Just as if Barnes were to have exchanged drugs or alcohol for food stamps and recorded the transactions as "legitimate" sales, the subtraction of sales from food stamp redemptions would result in an understatement of "loss." Once again, the sentencing judge calculated "loss" by subtracting total "legitimate" food sales from food stamp coupon redemptions, both "legitimate" and "illegitimate." We find this to have been a reasonable approach under the circumstances and do not believe clear error is manifest.

### 2. *Role in the Offense*

■ In addition to challenging the district court's "loss" computation under § 2F1.1, Barnes also appeals its imposition of a four level sentencing enhancement pursuant to § 3B1.1(a) for his role as "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). The sentencing judge held that Barnes had organized and led the food stamp scheme among his employees and, even if he did not control the ongoing criminal enterprise, that the fraud was nevertheless extensive. Barnes contests only the former of these two conclusions, and acquiesces in the sentencing court's finding that at least five individuals participated in the fraud. We review the district court's determination as to Barnes' role in the offense for clear error. *United States v. Randy,* 81 F.3d 65, 68 (7th Cir.1996) (citing *United States v. Michalek,* 54 F.3d 325 (7th Cir. 1995)).

■ Application Note 4 to § 3B1.1 sets forth the criteria that this court should con-

sider in distinguishing a leadership and organizational role from one of mere management or supervision. It reads, in relevant part:

Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, Application Note 4. Although the U.S.S.G. fails to articulate exactly which of these factors is paramount in a § 3B1.1 analysis, this court has required "[a] defendant receiving a 'leader or organizer' enhancement under sec. 3B1.1(a) [to have had] some control, direct or indirect, over at least four other participants in the offense." *United States v. Carson,* 9 F.3d 576, 584 (7th Cir.1993) (citing *United States v. Schweihs,* 971 F.2d 1302, 1318 (7th Cir.1992)). In other words, "the defendant must have exercised some degree of control over others involved in the commission of the offense or he must have been responsible for organizing others for the purpose of carrying out the crime." *Id.* at 585 (citing *United States v. Fuller,* 897 F.2d 1217, 1220 (1st Cir.1990)). Barnes argues that the only evidence implicating his involvement in the fraud was the testimony of one Agent Crow, an undercover agent to whom Philip Barnes explained that Arthur had instructed him (Philip), as well as his five co-employees, to purchase food stamps for cash at a rate of $0.67 on the dollar, and that Arthur used the cash from those transactions to fund future purchases. When the Government's lawyer attempted to elicit this information from Crow at sentencing, Barnes made a timely hearsay objection, and he was promptly overruled. Barnes now argues that his due process rights were violated because the agent's statements were not only hearsay, but also uncorroborated and unreliable.

This court has made clear that a sentencing judge *must* appraise all relevant information in order that he might make an enlightened decision as to the proper punishment in any given case. *United States v. Francis,* 39 F.3d 803, 809 (7th Cir.1994); *United States v. Torres,* 977 F.2d 321, 330 (7th Cir.1992). Towards this end, it is well-established that the Federal Rules of Evidence are inapplicable at sentencing hearings, *Francis,* 39 F.3d at 809, and "a sentencing judge is free to consider 'a wide variety of information that would be inadmissible at trial, including hearsay.'" *United States v. Beal,* 960 F.2d 629, 634 (7th Cir.1992) (quoting *United States v. Agyemang,* 876 F.2d 1264, 1271 (7th Cir. 1989)). Notwithstanding this relaxed rule of admissibility, "we have required that the hearsay evidence relied on by the sentencing court be reliable ... and that the defendant must have a reasonable opportunity to rebut the hearsay evidence used against him." *Francis,* 39 F.3d at 810 (citations omitted). Thus, we review the district court's determination as to the reliability of Crow's hearsay evidence for an abuse of discretion, *United States v. Johnson,* 997 F.2d 248, 254 (7th Cir.1993), which requires that Barnes "show that the information before the court was inaccurate, and that the court relied on it." *Id.*

In the instant case, the sentencing court ruled that Crow's hearsay statement was reliable to the extent that it was corroborated by evidence offered independently from Crow's testimony, as well as by Philip Barnes' own written account. Crow explained that Philip had told him, among other things, that Barnes instructed his employees to exchange food stamp coupons for $0.67 on the dollar, and that Barnes personally went to the bank two or three times a day and "would typically only deposit food stamp coupons ... for the fact that ... Barnes needed the cash in order for himself and others to continue to buy food stamps." As noted above, the exchange rates of the two transactions which Barnes conducted with undercover agents calculates to exactly sixty-seven percent. Moreover, a 1992 audit of Barnes' banking activity revealed that ninety-five percent of his total deposits for that year consisted of food stamp coupons. Finally, it is not only significant that the Government attorney provided Philip Barnes' written corroborating statements to the sentencing judge, but also that Philip

voluntarily contacted the D.O.A. with information regarding Barnes' fraudulent scheme even though he was subject to prosecution for his involvement therein. Each of these considerations supports the sentencing judge's conclusion that Crow's testimony was reliable. Barnes was also well aware that Crow's hearsay testimony would be used against him at his sentencing hearing. As such, he had ample opportunity to prepare for, and did in fact conduct, a vigorous and thorough cross-examination. For the forgoing reasons, we conclude that it was not an abuse of discretion for the sentencing court to have admitted Crow's hearsay testimony; his statements were reliable and Barnes had "a reasonable opportunity to rebut the hearsay evidence used against him." *Francis*, 39 F.3d at 810 (citations omitted).

■ Even if we were to accept as true Barnes' contention that the only evidence tending to incriminate him as the "organizer or leader of a criminal activity that involved five or more participants," U.S.S.G. § 3B1.1(a), was Agent Crow's hearsay testimony, we would have little difficulty affirming the sentencing judge's imposition of a four-level sentencing enhancement. But there exists a wealth of additional evidence upon which the district court relied in finding that Barnes exercised some degree of control over his employees in the commission of the offense. Undercover D.O.A. agents exchanged food stamp coupons for cash with six *different* Barnes employees, at two *different* Barnes-owned-and-operated grocery stores, on four *different* occasions.[10] Barnes himself funded each and every one of these transactions. We think it more than pure happenstance that six individuals, all of whom were on Barnes' payroll and did not even work at the same location, chose to illegally purchase foods stamps on four different occasions when offered to do so. Indeed, as the district court correctly points out, "It certainly follows . . . that defendant must have directed at least some of his employees to engage in illegal food stamp transactions." This evidence, when viewed in light of Agent Crow's testimony, leads us to only one conclusion—that Barnes was an "organizer or leader" of

five or more persons within the meaning of § 3B1.1(a) of the U.S.S.G., thereby supporting the four level sentence enhancement imposed below.

## IV. CONCLUSION

Every year, our government commits tremendous resources to ensuring that those less fortunate have sufficient food on their tables to lead healthy, productive lives. Unfortunately, the Food Stamp Program is not failsafe. It requires cooperation at all levels of the distribution chain. Hence, only government-approved retail food stores are entitled to accept food stamp coupons as payment for certain foodstuffs—they are prohibited from "knowingly us[ing], transfer[ring], acquir[ing] . . . or possess[ing] coupons in any manner not [consistent with this entitlement]." 7 U.S.C. § 2024.

The facts and circumstances surrounding this case powerfully suggest not only that Barnes personally redeemed approximately $2,974,444.00 in illegally-obtained food stamp coupons over the years 1987 through 1994, but that he knew such coupons were not acquired and/or transferred pursuant to Food Stamp Program rules and regulations. Indeed, Barnes himself twice purchased food stamp coupons from undercover D.O.A. agents in 1993. On four other occasions, various Family Market and Barnes Grocery employees also purchased food stamps from undercover agents. Barnes' own brother, Philip, explained to a D.O.A. agent that Barnes had instructed him, as well as his co-employees, to purchase food stamps at a rate of $0.67 on the dollar. Moreover, Barnes personally redeemed all food stamps coupons received through the two grocery stores at his local bank, kept a ledger of transactions for accounting purposes, and *knew* that a $652,706.00 discrepancy existed between food stamp redemptions and sales during 1992. In short, every bit of factual and circumstantial evidence in this case suggests that Barnes knew his employees were exchanging food stamp coupons for cash. As such, we believe that any rational trier of fact could have found that the essential elements of the

10. More than one employee was present during   some of the transactions.

crime were proven beyond a reasonable doubt. *See Hatchett,* 31 F.3d at 1416.

We are also of the view that the sentencing judge properly calculated "loss" for purposes of sentencing enhancement under § 2F1.1. The sentencing court's "loss" formula resulted in a reasonable measure of the value of benefits diverted from their intended use. The data submitted to the court for use in the "loss" formula was reliable, ultimately yielding a "loss" of $2,974,444.00 and, therefore, justifying a thirteen level sentence enhancement under § 2F1.1 of the U.S.S.G. Finally, we believe that the sentencing court's imposition of a four level sentence enhancement for Barnes' role as a leader or organizer of criminal activity was proper. The testimony introduced to the sentencing court was unequivocal in demonstrating, among other things, that Barnes instructed his employees as to the rate at which they should purchase food stamp coupons, and that he alone financed the fraud throughout its seven year course. Barnes' conviction and sentence are

AFFIRMED.