In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2423

United States of America,

Plaintiff-Appellee,

v.

Emad Jamal Hassan,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 CR 613-2--David H. Coar, Judge.

Argued February 9, 2000--Decided May 1, 2000

Before Bauer, Easterbrook, and Ripple, Circuit Judges.

Bauer, Circuit Judge. On November 20, 1998, after a bench trial, the district court found Emad Jamal Hassan guilty on two counts of food stamp fraud in violation of 7 U.S.C. sec.sec. 2024(b) and (c) and one count of conspiracy pursuant to 18 U.S.C. sec. 371. On May 18, 1999, Hassan was sentenced to thirty-seven months incarceration, three years of supervised release, and ordered to pay restitution in the amount of $1,031,873. Hassan appeals the district court's calculation of the total loss amount for sentencing purposes.

Background

In February 1994, Yousef Hassan, Emad's brother, opened the Halsted Street Market, a small neighborhood grocery store located at 7548 N. Halsted Street in Chicago. Yousef applied for a federal food stamp license with the USDA to enable the store to accept food stamps from customers. On the application, Yousef estimated the annual gross sales for the Halsted Market as $280,000 and the annual eligible food sales (food items eligible to be purchased with food stamps) as $200,000. The USDA approved the application and the store received its food stamp license in mid-May 1994. Emad worked at the store and functioned as its manager. He ran the day-to-day

operations of the store. He was assisted by his wife, Cathi, who worked in the store on a part-time basis.

Yousef, with the help of Maher Nubani, opened eight different bank accounts for the store between 1994 and 1995. From June 2, 1994 through April 21, 1995, Yousef and Emad redeemed over $1.2 million worth of food stamps in the Halsted Street Market bank accounts. Of the $1.2 million, a substantial amount of the food stamps were exchanged for cash in transactions with other neighborhood grocers who were not licensed to accept food stamps. Typically, Yousef and Emad purchased food stamps from other store owners at discounts, often 10%, deposited the stamps into their various bank accounts, and then collected full remuneration from the government.

At the trial, an official from the USDA testified that licensed store owners who illegally obtain stamps typically sell them to other licensed store owners to avoid being detected by the USDA for excessively high food stamp redemptions. The USDA monitors the actual redemptions of authorized food stores and compares those to the reported level of sales of the stores. Halsted Market's suspiciously high food stamp redemption rate alerted the USDA that there may be fraud afoot.

On September 1, 1998 both Yousef and Emad were indicted and charged with one count of conspiracy to defraud the United States government and commit food stamp trafficking and two counts of food stamp trafficking. Yousef has not been arrested and is considered a fugitive. Emad was arrested in Arlington, Texas and transferred to the Northern District of Illinois on August 28, 1998 to await trial. Emad then waived his right to a jury trial.

Maher Nubani, who owned and operated his own food store, testified he was barred from participating in the food stamp program because of a conviction in 1990 for food stamp fraud. Yousef and Emad regularly gave him cash in amounts ranging from $500 to $3,000 so that he would purchase food stamps from his customers at a discounted rate. He gave the food stamps to Yousef and Emad, who redeemed the food stamps through the Halsted Market bank accounts. Between May 1994 and February 1995 Nubani redeemed approximately $10,000 to $15,000 a month in food stamps through Yousef and Emad and the Halsted Market bank accounts.

Yousef and Emad prepared and signed bank deposit slips and food stamp redemption certificates and deposited the food stamps into

the Halsted Market accounts to seek reimbursement for the face value of the food stamps from the government. The USDA's account at the Federal Reserve then credited their accounts. Yousef and Emad withdrew the money and gave the cash value of the food stamps back to the store owners minus their 10% commission.

Nubani also testified that he personally witnessed, on multiple occasions, other grocery store owners illegally deliver and sell thousands of dollars worth of food stamps to Yousef and Emad, including Qais Nofal, Abed Mustafa, and Bashar Sweiss. Nubani stated that Yousef told him he only bought food stamps from people he knew because he was wary of undercover agents and that he did not want to take any chances with his food stamp license. Yousef also told Nubani that he only purchased stamps from other owners, never customers, to avoid the undercover agents. Nubani witnessed Yousef and Emad paying store owners for the food stamps they had redeemed for them from their bank accounts. Cathi Hassan also testified that Yousef told her not to buy stamps from customers. While working at the market she saw other Arabic males bring both Emad and Yousef large quantities of food stamps. Each night large amounts of food stamps were delivered to the apartment she shared with Emad and Yousef where they counted thousands of dollars worth of food stamps and prepared them for deposit.

On November 20, 1998, Emad was found guilty on all counts. On May 18, 1999 a sentencing hearing was held. Emad filed numerous objections to the probation officer's Sentencing Guideline calculations that were contained in the presentence investigation report. Specifically, Emad challenged the calculation of the amount of food stamp fraud loss attributable to him under sec. 2F1.1(b)(1). The PSR recommended and the government adopted a fraud loss estimate of $1,031,873. This figure was based on the testimony of Cathi Hassan in which she testified that when the store first opened the total gross sales averaged about $1000 to $1,200 a day. After about five months and until April 1995, sales decreased to between $300 and $500 because the cooler broke and meat sales ceased. These figures are similar to the figures Yousef used in his application for the food stamp license. Legitimate sales during this time were approximately $209,700. The loss figure was derived by subtracting Halsted Market's actual total sales from its actual food stamp redemption ($1,241,573) for a total of $1,031,873.

Emad appeals this calculation.

Analysis

Emad argues that the district court improperly shifted the burden of proof to him in calculating the loss. Section 2F1.1(b) of the Sentencing Guidelines applies to crimes of fraud and deceit, which is included under 18 U.S.C. sec. 2024(b) and (c). Under the Guidelines, if the amount of loss is over $2,000, the sentence is enhanced according to the amount of loss caused. See sec. 2F1.1(b)(1). The district court's finding of a loss amount of $1,031,873 resulted in an eleven-point offense level enhancement which raised his minimum sentence from 6 months to 37 months.

The calculation of the amount of loss by the district court is reviewed for clear error while the determination of the meaning of "loss" is reviewed de novo. United States v. Brown, 136 F.3d 1176 (7th Cir. 1998).

Under U.S.S.G. sec. 2F1.1(b)(1), a district court may increase the sentence of one who has violated 7 U.S.C. sec. 2024(b)(1) by eleven levels if such offense resulted in a "loss" exceeding $800,000. For purposes of sec. 2F1.1(b)(1), the loss need not be determined with precision. U.S.S.G. sec. 2F1.1, Application Note 8. Rather, "[t]he [sentencing] court need only make a reasonable estimate of the loss, given the available information." Id. A defendant appealing the court's loss calculation must carry the heavy burden that the determination "was not only inaccurate but outside the realm of permissible computations." United States v. Jackson, 25 F.3d 327, 330 (6th Cir. 1994).

In United States v. Barnes, 117 F.3d 328, 335 (7th Cir. 1997), we defined "loss" in the context of food stamp fraud as "the value of the benefits diverted from intended recipients or uses." The court stated that the "intended use" of food stamps is to purchase specified food products from authorized retailers. Id. In determining the amount of loss, the court should calculate the aggregated food stamp redemptions less actual food sales. Id.

Citing the Supreme Court's decision in Liparota v. United States, 471 U.S. 419, 426 (1985), Barnes recognized that:

[Section] 2024(b)(1) declared it criminal to use, transfer, acquire, alter, or possess food stamps in any manner not authorized by statute or regulations. The statute provides further that "[c]oupons issued to eligible households shall be used by them only to purchase food in retail stores which have been approved for participation in the food stamp program at prices prevailing in such stores." 7 U.S.C. sec. 2016(b) (emphasis

added); see also 7 CFR sec. 274.10(a) (1985). This seems to be the only authorized use.

Id. The applicable regulation provides in pertinent part that:

Coupons may be accepted by an authorized retail food store only from eligible households or the households' authorized representative, and only in exchange for eligible food. Coupons may not be accepted in exchange for cash, except when cash is returned as change in a transaction in which coupons were accepted in payment for eligible food under paragraph (d) of this section. Coupons may not be accepted in payment of interest on loans or for any other nonfood use. An authorized retail food store may not accept coupons from another retail food store. . .

7 CFR sec. 278.2(a). Further, illegal redemption of coupons violates 7 U.S.C. sec. 2024(c) which provides:

whoever presents, or causes to be presented, coupons for payment or redemption of the value of $100 or more, knowing the same to have been received, transferred, or used in any manner in violation of the provisions of this chapter in violation of the provisions of this chapter or the regulations issued pursuant to this chapter shall be guilty of a felony.

In the present case, the government and the PSR recommended a calculation that followed the reasoning in Liparota and Barnes. The loss figure was established by subtracting Halsted Market's legitimate sales from the actual food stamp redemptions. Emad, however, argues that the calculations do not take into account the value of food stamps exchanged for legitimate food purchases.

Emad contends that the government only accounted for $150,000 of the purported loss through the testimony of Nubani. The remaining $880,000 he claims was not supported by the evidence. In fact, he argues that not every illegal transaction of food stamps creates a loss for the government under sec. 2F1.1 and that most likely some of the transactions involved the purchase of legitimate food items in exchange for the food stamps. The mere fact that a store owner accepted food stamps for authorized goods is not the issue. The violation occurs when the store owner not licensed to accept food stamps does so and then sells them to a licensed store owner to be redeemed. These illegal cash transfers constitute an illegal diversion from the food stamp programs' intended uses and recipients under U.S.S.G. sec. 2F1.1.

In United States v. Cheng, 96 F.3d 654, 657 (2nd Cir. 1996), the court stated that food stamps diverted from the intended use cause a loss under sec.2F1.1. The Sentencing Guidelines consider the defendant's secondary illegal receipt of stamps to be the same as the initial illegal receipt. Id. Absent a reason by the defendant why the stamps would be illegally redeemed through him rather than through the proper legal channels, the court concluded that the stamps were diverted from their intended use and upheld the district courts determination of loss. Id.

As the court stated in Barnes, the purpose of the food stamp program is to ensure that every citizen of this nation receives sufficient nutrition to enjoy a healthy existence. Barnes, at 335. Through Emad's fraudulent actions he has frustrated this goal. Exchanging food stamps with parties not authorized by the USDA amounts to a "loss" of the entire value because the unauthorized transaction diverts the intended use of the food stamps away from those less fortunate.

The district court in determining the "loss" attributable to Emad did not improperly shift the burden of proof to him. The court, finding that the government had met its burden, stated:

The government has established the volume of business, the legitimate business in the store, and the government has established the amount of redemptions. The figures used to calculate the "loss" were based on the testimony of several witnesses including Cathi Hassan, Nubani and the USDA agent.

The court then gave Emad the opportunity to rebut, like an affirmative defense, the government's evidence and to establish that some of the transactions were legitimate. Emad made no showing and in the absence of any showing the court overruled the objection. The court did not err in making this determination.

Therefore the decision of the district court is Affirmed.