**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Glen DANIEL, Defendant–Appellant.**

**No. 02–2435.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 5, 2002.

Decided April 9, 2003.

Before FLAUM, Chief Judge,
CUDAHY, and COFFEY, Circuit Judges.

## ORDER

Glen Daniel pleaded guilty to a one-count indictment charging him as a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and (2). At sentencing, the court increased Daniel's offense level, pursuant to U.S.S.G. § 2K2.1(b)(5), based on its finding that Daniel had possessed or used a firearm in connection with another felony-namely, an attempted armed robbery. Daniel argued below, and maintains before this court, that the evidence suggesting a connection between himself and the attempted robbery was not reliable, and was insufficient to support a finding that he participated in the alleged crime. The court sentenced Daniel to a term of 70 months imprisonment, to be followed by three years of supervised release. We affirm.

### I. Facts

In July of 1999, Glen Daniel was convicted of armed robbery in Milwaukee County Circuit Court. After serving one year in the House of Correction on the armed robbery charge,[1] on August 31, 2001, Daniel was discovered by police in possession of a sawed-off shotgun that he later admitted was his. Daniel was indicted on one charge of being a felon in possession of a firearm. Pursuant to a plea agreement, Daniel pleaded guilty to the one-count felony charge. At sentencing, the Government recommended a four-level enhancement under U.S.S.G. § 2K2.1(b)(5) on the basis that, according to prosecutors, the firearm owned by Daniel, and found in his possession on August 31, 2001, had been used in an attempted armed robbery earlier that day.

Prosecutors presented the sentencing court with evidence that, at 5:30 a.m. on August 31, 2001, two persons attempted to rob Royce Hall near the entrance to Kern Park (the "Park"), in Milwaukee, Wisconsin. The investigating officer, Detective Timothy Duffy, was not present at the sentencing because he "[was] not ... subpoenaed," Sent. Tr. at 39, but by agreement of the prosecution and defense counsel, Duffy's police report was submitted to the court.

In his statement to Officer Duffy (contained in Duffy's report, submitted to the sentencing court), Hall recounted that on the morning of August 31, 2001, as he was walking through Kern Park with his female companion, Kelly Keedy, Keedy ran ahead of him to swing on the Park's swing set. As Hall continued to walk through the Park, he passed a row of bushes, and smelled the scent of marijuana. At that point, two men "jump[ed] out of the bushes, [and] point[ed] something at [Hall that he] fear[ed] [wa]s a gun." Sent. Tr. at 9. According to Hall, the person in possession of "what he th[ought] was a gun" demanded: " 'give me your mother f-ing money.' " *Id.* Despite the assailants' further directions "n[o]t [to] move," *id.*, Hall gave chase, and was followed for some time by the two males who continued to yell out to him, " 'don't run.' " *Id.* Hall described his assailants as two black men in dark clothing, and noted that the man whom he believed was armed was between 20 and 25 years of age, wearing a red bandana, and was approximately five feet eight or ten inches tall, with a slim to medium build.

On the morning of the incident, Ms. Carla Giano–Wergin was visiting her mother in her house, near the entrance to the Park. Giano–Wergin testified at the sentencing hearing that, around 5:30 a.m. that morning, she saw two black males,

---

1. In addition to serving a one-year sentence in the House of Correction, Daniel was subject to ten years of probation in connection with the armed robbery charge.

both wearing dark clothing, exit a car and head towards Kern Park. Suspicious that the men were dropping off a stolen vehicle, Giano–Wergin took note of the vehicle's license plate number, which was "940–BUU." Less than ten minutes later, Ms. Giano–Wergin noticed the vehicle was gone. She exited her mother's house and was immediately flagged down by Kelly Keedy, who sought help because she had seen her companion, Royce Hall, chased away by two black males. The women immediately called the authorities.

When police arrived, Ms. Giano–Wergin reported the license plate number of the vehicle she had seen parked near the entrance to the Park, and described the vehicle as a "big boat, like a square model car, dark color, two door." Sent. Tr. at 20. She also informed authorities that one of the individuals who had exited the vehicle "was wearing dark clothes and a red bandana on his head." Sent. Tr. at 20.

The police traced the car to Defendant Glen Daniel (in whose name the plates were licensed) and dispatched officers to Daniel's residence. Officer Herbert Smith began monitoring Daniel's residence soon thereafter and, as he testified at the sentencing hearing, observed Daniel approach the apartment building at around 7:00 a.m. (less than two hours after the attempted robbery). Daniel was driving the same automobile Ms. Giano–Wergin had seen near the Park that morning (matching license plate, same description). Daniel was transporting two other black males who, upon arriving at Daniel's apartment building, exited the vehicle and entered the residence. Daniel remained outside, standing next to his car. Officer Smith noted that Daniel was around 5 foot 8 inches tall, around 135 pounds, 18 to 20 years old, was wearing a blue t-shirt and black sweat pants, matching the description given by Hall. After making these initial observations, Officer Smith approached Daniel to conduct a field interview. As soon as he spotted Officer Smith, Daniel fled. Upon searching Daniel's abandoned car, police discovered a sawed-off shotgun in the back of the car, in plain view. The shotgun was later determined to belong to Daniel.

On September 11, 2001, after receiving a Miranda warning, Daniel admitted to police that he owned the sawed-off shotgun found in the car he was driving on August 31, and stated that the car belonged to his father, but that the license plates on the car were registered in his name. He stated that he "always" kept his sawed-off shotgun in his own car, which was broken down at the time. Sent. Tr. at 13. And, although he was using his father's car in lieu of his own car (broken down), he claimed that he had not transferred the gun into his father's car that morning. Instead, he denied any knowledge that the gun was in the car the morning he fled from Officer Smith.

## II. Analysis

Daniel's sentence was enhanced four levels under U.S.S.G. § 2K2.1(b)(5) for "us[ing] or possess[ing] a[ ] firearm . . . in connection with another felony offense," the other offense in this case being the armed robbery attempt. U.S.S.G. § 2K2.1(b)(5). On appeal, Daniel contends that the court erred in applying the four-level increase because it: (1) improperly relied on hearsay evidence to find that a gun was used during a robbery attempt on Royce Hall, and (2) incorrectly concluded that Daniel was involved in that robbery attempt.[2]

**2.** Daniel did not challenge the Government's charge of felony in possession of a firearm, but instead plead guilty to that offense.

*1. Hearsay Evidence*

■ It is well-settled that sentencing courts are "free to consider a wide variety of information that would be inadmissible at trial, including hearsay." *United States v. Barnes,* 117 F.3d 328, 336 (7th Cir.1997) (citations omitted). Thus, "[h]earsay is admissible at a sentencing hearing as long as the evidence is reliable and the defendant has the opportunity to rebut it." *United States v. Simmons,* 218 F.3d 692, 695 (7th Cir.2000). We review the sentencing court's determination as to the reliability of hearsay evidence for an abuse of discretion, *see United States v. Szakacs,* 212 F.3d 344, 347 (7th Cir.2000), and will reverse such a determination only if a defendant demonstrates that the evidence in question was "inaccurate," and that the sentencing court relied upon it. *Barnes,* 117 F.3d at 337.

Daniel argues that the evidence that his gun was used in the robbery attempt on Royce Hall lacked even a minimal indicia of reliability, because Detective Duffy (the officer who interviewed Hall) and Hall (who provided the information regarding the use of a weapon) were not present to testify at the hearing. Appellant's Br. at 14–16. We note at the outset that the reason that Duffy was not present at that hearing was that Defendant "ha[d] not . . . subpoenaed" him, *id.,* and because both prosecution and defense counsel had agreed that Duffy's report would be submitted into evidence in lieu of live testimony. Because Defendant's counsel herself failed to subpoena Duffy, and thus "asked the [sentencing court to] accept in full Officer Duffy's reports," Sent. Tr. at 39, we fail to ascertain the basis for Defendant's argument, on appeal, that it was improper for the sentencing court to rely upon Duffy's police report.

In any case, Daniel has cited to no evidence in the record that the hearsay contained in the report was unreliable, much less "inaccurate." On the contrary, the testimony of Royce Hall contained in the police report was credible because it was *corroborated by other evidence,* including the in-court testimony of Ms. Giano–Wergin and Officer Smith. Hall's statement was that two black men tried to rob him, near the entrance of Kern Park, and that, during the robbery, one of the two assailants "pointed something" toward him that he "feared" was a gun and ordered him to "turn over his f-ing" money. Hall specified that the assailant whom he "feared" was carrying a weapon was also wearing a red bandana.

The in-court testimony of Giano–Wergin corroborated Hall's statements, insofar as she testified that, just before Hall was robbed, she observed two black men exit an automobile (later determined to be Daniel's automobile) parked near the scene of the crime (the entrance to the Park).[3] Also consistent with Hall's statement, Giano–Wergin testified that one of the men *was wearing a red bandana.*

Additionally, the in-court testimony of Officer Smith established that Daniel was driving a car bearing his own license plates (seen at the scene of the crime) just a short time after the incident occurred, and

3. Giano–Wergin's observation of the two men whom she accurately described as leaving the parked car and entering the Park at around 5:30 a.m. was particularly significant given that, as she testified, there were no other people in the area of the park that morning. The absence of other people in the park (given the early hour) makes it highly likely that the two men observed by Giano–Wergin were the same two men involved in the attempted robbery of Mr. Hall (same time, same place). This is particularly true considering that one of the two men observed by Giano–Wergin was wearing a red bandana, as was one of the two men who (shortly thereafter) tried to rob Mr. Hall just inside the entrance to the Park.

that there was a sawed-off shot gun found inside the car at that time, and also that Daniel matched Hall's description of one of the assailants. Officer Smith's discovery of the gun, his description of Daniel (consistent with Hall's and Giano–Wergin's descriptions of the perpetrator), and also his testimony that Daniel fled as soon as Smith began to approach him (in spite of Daniel's claim that he was "unaware" that the gun was inside the car) not only linked Daniel to the robbery in Kern Park, but also served to confirm Hall's "fear" that his assailants had used a gun to threaten him during their robbery attempt.

In closing, we reiterate that it is difficult to reconcile Daniel's current argument that the hearsay in the police report was "unreliable" with his trial counsel's stipulation at sentencing that the police report was admissible. Thus, we are left to ponder why defense counsel at sentencing requested that the court "accept in full Officer Duffy's [police] report[ ]," Sent. Tr. at 39, if, as Daniel argues, the report was "unreliable." In any event, "[a]s we have repeatedly explained, hearsay is permitted at sentencing if it is reliable [and] reliability may be established by corroborating evidence." *United States v. Martinez*, 289 F.3d 1023, 1028–29 (7th Cir.2002). We are convinced that, in light of the corroboration of Hall's account provided by the combined testimony of Officer Smith and Ms. Giano–Wergin, Hall's hearsay testimony set forth in Officer Duffy's police report *was* sufficiently reliable for use by the district court in its determination regarding the sentencing enhancement.

*B. Factual finding*

Daniel also objects to three of the district court's findings of fact, which this Court reviews for clear error. *U.S. v. Charles*, 238 F.3d 916, 918 (7th Cir.2001). Importantly, in evaluating the available evidence, if the district court chose one of two permissible inferences, there is no clear error. *Id.* Thus, reversal is warranted only if " 'after considering all of the evidence, the reviewing court is left with the definite and firm conviction that a mistake has been committed.' " *United States v. Wyatt*, 102 F.3d 241, 246 (7th Cir.1996) (quoting *United States v. Messino*, 55 F.3d 1241, 1247 (7th Cir.1995)).

Daniel disagrees with the following inferences drawn by the sentencing court: (1) that the gun owned by Defendant and found in his father's car (black Buick LeSabre)[4] on August 31, 2001 was the same gun used in the attempted armed robbery of Hall earlier that morning; (2) that the car Defendant was driving, at 7:00 a.m. on August 31, 2001, was the same car involved in the robbery attempted after 5:30 a.m. that morning; and (3) that Defendant himself was involved in the attempted robbery. Unfortunately for Daniel, the district court's conclusions with regards to these factual findings were all permissible inferences, and, as is well-settled, a district court's "choice between two permissible inferences from the evidence cannot be clearly erroneous." *United States v. Charles*, 238 F.3d 916, 918 (7th Cir.2001).

First, Daniel argues that the sentencing court should not have concluded that the sawed-off shot gun found in his car (and to which he admitted ownership)

---

4. We note that, although the black Buick LeSabre was owned by Daniel's father, Daniel himself was observed (by Officer Smith) driving the car later in the morning on the day of the attempted armed robbery. In his statement to police officers, Daniel admitted that his own car was broken down at the time, and that he had affixed his own license plates (940–BUU) to his father's car (Buick LeSabre) so that he could use the vehicle himself. *See* Sent. Tr. at 13.

was used in the armed robbery earlier that morning. Specifically, he argues that "[i]f a gun was pointed at Royce Hall ... it could not have been the gun recovered from [Defendant's car]," because the gun found in Defendant's car was a *sawed-off shotgun.* Daniel reasons that, "[i]f the recovered shotgun with the 13–inch barrel was pointed at Hall, it is only reasonable that he would have known that it was, in fact, a gun ...". Daniel's Br. at 20. However, according to the record, it was still dark outside at the time of the attempted robbery of Mr. Hall (5:30 a.m.). Sent. Tr. at 17 ("[Was it] light out or dark out [at the time of the robbery]?" "Dark."). Thus, considering the conditions (still dark), and the stress and excitement of the moment (attempted robbery), it was entirely understandable, and certainly not unreasonable, that Hall could not make out exactly what type of object or weapon was pointed at him-no matter how big the gun was that was used in the robbery attempt. Defendant is thus incorrect that, if the assailant had been carrying a sawed-off shotgun, Hall would have necessarily been able to identify the gun.

In any case, the court did not clearly commit error in its determination that what Hall "feared" was a weapon was in fact a gun, or that the gun pointed at Hall *was* Defendant's sawed-off shotgun. Instead, the court drew permissible inferences from a number of facts established at the sentencing hearing-namely, that a car bearing Defendant's license plates was spotted at the crime scene, carrying the perpetrators of the crime (red bandana), that Hall stated immediately after the robbery that he had observed one of the assailants point at him (Hall) "something [that he (Hall)] fear[ed][wa]s a gun," Sent. Tr. at 9, and that, soon after the crime, the Defendant (who matched Hall's description of the perpetrator) was observed to be driving the car spotted at the scene of the

crime, and in possession of his own sawed-off shotgun (back seat).

■ Daniel also argues that the court should not have concluded that the car Defendant was driving at 7:00 a.m. on August 31, 2001, was also the car used in connection with the robbery earlier that morning. But this, too, was a permissible inference of the sentencing court based on reliable evidence presented at the sentencing hearing. After all, Ms. Giano–Wergin gave testimony that two black males, in their early twenties, one with a bandana on his head, left a car bearing Daniel's license plates ("940–BUU") to enter the Park, at 5:30 a.m. Royce Hall reported to have been attacked in the Park, soon thereafter, by two black males, in their early twenties, one with a red bandana on his head. Moreover, Ms. Giano–Wergin noted that no one else was in the area of the Park. Such evidence sufficiently supports the Court's inference that the black LeSabre with license plates registered to Defendant, which matched the description of the vehicle observed by Ms. Giano–Wergin near the entrance to the Park, was used in connection with the robbery.

■ Lastly, we are convinced that the court's conclusion that Daniel himself was involved in the robbery was not clearly erroneous. Daniel clearly meets the victim's physical description of the gun-wielding perpetrator (black male, 20–25 years of age, 5' 8" to 5' 10", slim to medium build, wearing dark clothing), for, at the time of arrest, Daniel was, in fact, 20 years old, 5' 11", and 160 lbs. And, as observed by Officer Smith, Daniel was wearing a blue t-shirt and black pants on the morning of the robbery, which matched Hall's description of the "dark clothing" worn by his attackers. Moreover, Daniel admits that the license plates on the car spotted at the crime scene were registered to him and,

just an hour and a half after the crime, Daniel was observed driving the same car bearing his plates, in possession of a firearm (back seat of the car). Finally, when he was approached by Officer Smith for questioning, Daniel immediately fled, with no apparent reason for doing so (he denied any knowledge that the gun was in the car).

 We agree with the sentencing court that, "even though Mr. Hall c[ould]n't make a positive identification that [the sawed-off shot] gun was used [by his assailants]," the circumstantial evidence strongly implicated Daniel in the robbery (red bandana, physical description, car), and was sufficient to "allow the court to conclude that [Daniel's gun] was possessed in connection with another felony offense." Sent. Tr. at 61.

Affirmed.