UNITED STATES of America, Appellee,

v.

Man Wai CHENG, Defendant,

Kin Wo Cheng, Defendant–Appellant.

No. 1585, Docket 95–1704.

United States Court of Appeals,
Second Circuit.

Argued May 30, 1996.

Decided Sept. 30, 1996.

Maria L. Zanfini, Assistant United States Attorney, New York City (Mary Jo White, United States Attorney for the Southern District of New York, Marian W. Payson, Assistant United States Attorney, of counsel), for Appellee.

Barry A. Bohrer, New York City (Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., New York City, Craig A. Isaacs, of counsel), for Defendant–Appellant.

Before LUMBARD, VAN GRAAFEILAND and LEVAL, Circuit Judges.

LUMBARD, Circuit Judge:

Kin Wo Cheng appeals from a judgment of conviction entered on December 27, 1995 in the District Court for the Southern District of New York (Keenan, *J.*). Cheng pleaded guilty to conspiring to unlawfully receive and redeem food stamps, in violation of 18 U.S.C.

§ 371, and to income tax evasion, in violation of 26 U.S.C. § 7201 and 18 U.S.C. § 2. The district court found that Cheng's unlawful use of food stamps had caused a loss to the government of $3.5 million, which yielded a prison term of 18 months under the Sentencing Guidelines. The court also ordered Cheng to pay $750,000 restitution, under 18 U.S.C. §§ 3663 and 3664. Cheng challenges the sentencing enhancement, arguing that his actions did not cause any loss and that the government did not adequately prove a loss by showing that the food stamps were diverted from their intended beneficiaries. He also claims the restitution order was improper because the government did not prove any *actual* loss. We affirm.

Since 1989, Kin Wo Cheng has owned and operated a Manhattan business that supplies wholesale food to Chinese restaurants. In 1990, for reasons not disclosed in the record, some of the restaurants started paying for Cheng's supplies with food stamps. Cheng, however, had no authority from the United States Department of Agriculture (USDA) to receive food stamps. Generally, food stamps can only be received and converted into cash by retail grocery stores; wholesalers, like Cheng, and most restaurants, like Cheng's customers, are prohibited from accepting them. *See* 7 U.S.C. § 2018(b)(1); 7 C.F.R. § 278.1; 7 C.F.R. § 271.2.

Cheng used the food stamps to pay his meat supplier, Puello Meat and Provisions, because Puello had USDA approval to receive food stamps and convert them into cash. From 1990 to 1992, Cheng transferred $1.8 million worth of food stamps to Puello. Puello, however, had gotten USDA approval illegally, by fraudulently claiming that it ran a retail meat business.

In March 1992, the USDA discovered Puello's fraud and shut down its illegal food-stamp operation. In 1992, Cheng got USDA approval for his business to receive food stamps, by falsely claiming in his application that he ran a retail grocery store. From 1992 to 1994, Cheng converted into cash $1.7 million in food stamps which he had received primarily from his restaurant customers.

In 1995, Cheng's scheme was uncovered and he was charged with tax evasion, in

violation of 26 U.S.C. § 7201, and conspiracy to unlawfully receive and redeem food stamps, in violation of 18 U.S.C. § 371. In June 1995, he pleaded guilty to both counts. At sentencing, the district court concluded that Cheng had caused a loss of $3.5 million—the 1.8 million in food stamps he transferred to Puello and the 1.7 million he redeemed himself. U.S.S.G. § 2F1.1, which governs "Offenses Involving Fraud and Deceit," sets a base offense level of 6, which is enhanced according to the amount of the loss caused by the fraud. For losses between $2.5 and $5 million the Guideline adds 13 levels. After arriving at an offense level of 19 accordingly, the district court departed downward 3 levels, because it concluded that the $3.5 million loss overstated the seriousness of the offense, added two levels for more than minimal planning, subtracted three levels for acceptance of responsibility, and sentenced Cheng to 18 months. The court also ordered Cheng to pay $750,000 restitution to the government.

Cheng argues that the restitution order and the 13–level enhancement for loss were unwarranted because his wrongdoing did not cause any loss. He relies on Application Note 7(d) to Guideline 2F1.1, which discusses how a court should value a loss in fraud cases. Application Note 7 observes that

> [a]s in theft cases, loss is the value of the money, property, or services unlawfully taken.... Frequently, loss in a fraud case will be the same as in a theft case. For example, if the fraud consisted of selling or attempting to sell $40,000 in worthless securities, or representing that a forged check for $40,000 was genuine, the loss would be $40,000.

> There are, however, instances where additional factors are to be considered in determining the loss or intended loss:

> . . .

> (d) *Diversion of Government Program Benefits*

> In a case involving diversion of government program benefits, loss is the value of

the benefits diverted from intended recipients or uses.

U.S.S.G. § 2F1.1, App. N. 7.

█ Based on this Note, Cheng argues that only those who illegally obtain food stamps from the original food-stamp recipients cause them to be "diverted from [their] intended recipients or uses." For example, if a vendor sells a food-stamp recipient unauthorized products, such as restaurant food, in exchange for food stamps, the vendor has illegally caused food stamps to be diverted from their intended use, the purchase of groceries. But if the vendor then gives those food stamps to Cheng in return for his supplies, only the vendor, not Cheng, actually caused food stamps to be diverted from their intended use. Because there was no showing that Cheng received food stamps directly from food stamp recipients, he argues that his misconduct did not cause any loss within the meaning of Application Note 7(d). He relies on three recent decisions from the Eastern District of New York. *See United States v. Caba,* 911 F.Supp. 630 (E.D.N.Y. 1996); *United States v. Puello,* No. 92 Cr. 1194 (E.D.N.Y. Aug. 6, 1993 and Aug. 26, 1993), *aff'd on other grounds,* 21 F.3d 7 (2d Cir.1994); *United States v. Garced,* No. 92 Cr. 934 (E.D.N.Y. Dec. 31, 1992).

█ We disagree. Because Cheng's crimes contributed to the food stamps being diverted from their intended use, he caused a loss within the meaning of Note 7(d). One who accepts food stamps from another who has obtained them illegally from food-stamp recipients helps the initial wrongdoer convert the stamps into cash or other valuables, thereby causing a loss much like someone who receives stolen property from a thief. The Guidelines value a loss caused by fraud like a loss caused by theft. Just as the Guidelines treat receipt of stolen property the same as they treat the original theft, *see* U.S.S.G. 2B1.1, App. N. 2., we think they similarly treat the secondary illegal receipt of food stamps the same as the initial illegal receipt.

█ Cheng also argues that these stamps were not diverted from their intended use because there is no proof that they were ever traded for an unauthorized product. Although restaurants are generally prohibited from accepting food stamps, *see* 7 C.F.R. § 271.2, Cheng maintains that the restaurants that gave him stamps may have gotten them lawfully under a special program in New York state, called the "Meals Program." This program permits a limited number of restaurants to accept food stamps for meals served to the homeless, elderly, and disabled. Cheng argues that the government lacks proof that the restaurants did not get the stamps through this program or that the stamps were not properly traded for authorized food before being given to the restaurants.

We believe the record supports the district court's conclusion that the food stamps Cheng received were diverted from their intended use. If the food stamps Cheng misused were originally traded in authorized transactions, Cheng has provided us with no reason to explain why they would then be illegally given to the restaurants or to him rather than redeemed through the proper channels. The logical and permissible inference is that the stamps were not initially traded in authorized transactions. This inference is strengthened by the fact that there are only approximately 100 restaurants throughout New York City and Nassau, Suffolk, and Westchester counties that are authorized to accept food stamps, and then only for meals served to the homeless, elderly and disabled. Indeed, Cheng never asserted in the district court that he believed the stamps came from authorized transactions under the Meals Program. Yet Cheng now asks us to believe that the $3.5 million in food stamps were received by these restaurants for meals provided to the homeless, after which they illegally gave the stamps to him rather than redeeming them through the proper channels. We see no reason to upset the district court's determination of the loss caused by Cheng's misuse of food stamps. *See also* U.S.S.G. § 2F1.1, App. N. 8.

█ We also agree with district court's decision to order restitution. Although § 2F1.1 of the Sentencing Guidelines allows for loss calculation based on "intended loss," 18 U.S.C. §§ 3663 and 3664 require a show-

ing of *actual* loss for restitution calculations. We feel the record supports the district court's inference that actual loss did occur.

Profiting through illegal traffic in food stamps requires the existence of an ultimate purchaser in the illegal chain who is authorized to redeem them, and will buy the illegal stamps (usually at a discount) in order to redeem at full value. As to all the stamps that passed illegally through Cheng's hands, it is highly probable that a later holder redeemed them at full value, causing the government the *actual* loss of the full value of the stamps. Thus, although loss to the government was not *directly* proved, the circumstances strongly support the permissible inference that it occurred.

Affirmed.