# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-3848

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

FAYEZ ALBURAY,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 02 CR 235—**George W. Lindberg**, *Judge.*

_____

ARGUED FEBRUARY 17, 2005—DECIDED JULY 29, 2005

_____

Before POSNER, RIPPLE, and MANION, *Circuit Judges.*

MANION, *Circuit Judge.* Fayez Alburay ran a grocery store as well as a food stamp scam that defrauded the United States Department of Agriculture ("USDA") out of more than a million dollars. His scheme landed him in federal court, where he pleaded guilty to wire fraud, and in federal prison, where he is serving a fifty-one-month sentence. On appeal, he challenges his sentence, a condition of his supervised release, and the district court's $1,750,000 restitution award. We affirm the sentence but remand with instructions on the supervised release and restitution issues.

## I.

Fayez Alburay owned and operated a neighborhood grocery—as it turned out, appropriately named the Shady Food Store—located at 11300 South Wentworth Avenue in Chicago, Illinois. Upon Alburay's application on behalf of his store, the USDA authorized Shady Food to operate under the federal food stamp program. Under the program, Shady Food accepted food stamps or the modern electronic equivalent thereof (collectively, "food stamps" or "stamps")[1] from food stamp recipients as payment for qualified food items such as fruit and vegetables (and not for such things as alcohol and tobacco products). On behalf of Shady Food, Alburay then redeemed the stamps by presenting them to a bank that would then credit the store with a cash deposit. The USDA would then reimburse the bank for the cash value of the stamps.

The food stamp program no doubt generated business volume that Shady Food may not have otherwise had. For Alburay, however, that increase was apparently not enough. He devised a scheme whereby he would accept food stamps in exchange for cash instead of qualified food items (cash that could then be used for *anything*). Alburay made these unlawful exchanges worth his while by paying less than the

---

[1] Traditional food stamp coupons have been replaced by "electronic benefit transfer cards." The card system sends food stamp program benefits to recipients through electronic fund transfers, by which program benefits are added to a recipient's card each month. In order for the recipient to access the benefits, he must present his card to an authorized retailer to acquire eligible food items. Authorized retailers have a unique point-of-sale machine designed to accept these cards. Retailers then redeem the received card benefits through additional electronic fund transfers.

face value of the stamps. For example, someone would give Alburay $100 worth of stamps, and Alburay would return only $70 worth of cash. "Customers" apparently preferred the lower cash amount instead of the higher- valued but restricted stamps. To complete the scheme, Alburay presented the unlawfully obtained stamps to the bank and received the full face value of the stamps, thereby fraudulently acquiring funds from the USDA. The scheme ran from 1996 to 1998, spanning twenty-five months.

Alburay's guilt in these matters is undisputed. After the government charged Alburay with nine criminal counts, he pleaded guilty to one count of wire fraud, 18 U.S.C. § 1343. In accordance with a written plea agreement, the other counts were dismissed. The dismissed charges were two additional counts of wire fraud, three counts of mail fraud, 18 U.S.C. § 1341, and three counts of food stamp fraud, 7 U.S.C. § 2024(c).

In the deal, the government and Alburay agreed that U.S.S.G. § 2F1.1(a) (1997) provided the appropriate base offense level for this case—six. They also agreed that the offense involved more than minimal planning, and, as a result, two more levels were added pursuant to § 2F1.1(b)(2)(A). In the agreement, the government stated that it believed that the amount of loss caused by the scheme ranged from $1,500,000 to $2,500,000, which would carry a twelve-level enhancement under § 2F1.1(b)(1)(M). Alburay, on the other hand, maintained that the loss figure was lower and reserved the right to argue the issue. Also, under the agreement, Alburay was on track for a three-level reduction for his acceptance of responsibility under U.S.S.G. § 3E1.1.

Nevertheless, Alburay's opportunity for an acceptance-of-responsibility reduction dissipated because, after pleading guilty and while on release pending sentencing, Alburay

failed to appear for his sentencing hearing. The district court issued a fugitive warrant, and, several weeks later, he was arrested after a routine traffic stop in Elko, Nevada. Alburay, a citizen of Jordan, had obtained a passport under an alias and was apparently preparing to flee the United States to avoid his impending punishment. Alburay's detour was a costly mistake. At sentencing, the district court rejected the acceptance-of-responsibility reduction and added a two-level obstruction-of-justice enhancement for willfully failing to appear for sentencing in accordance with U.S.S.G. § 3C1.1.

As to the loss amount, the government submitted an analysis to the probation officer estimating the loss at $1,750,000, which the probation officer incorporated into her presentence investigation report. The district court adopted the $1,750,000 figure for purposes of sentencing and restitution. As indicated above, a loss amount of $1,750,000 equated to a twelve-level enhancement under § 2F1.1(b)(1)(M).

Additionally, Alburay moved for a downward departure based upon hardships resulting from his status as a deportable alien. *See, e.g., United States v. Meza-Urtado*, 351 F.3d 301, 304-05 (7th Cir. 2003). The district court, however, *sua sponte* entertained the idea of an upward departure, believing that Alburay's category I criminal history vastly understated his past conduct and that his past conduct coupled with his multiple aliases, social security numbers, and driver's licenses showed a serious disregard for the law. Balancing these considerations, the district court denied Alburay's motion and opted against an upward departure.

The bottom line was a total offense level of twenty-two (six for the base, two for more than minimal planning, twelve for the loss, and two for obstructing justice). With the category I criminal history, the sentencing range was forty-

one to fifty-one months of imprisonment, and the district court sentenced at the top of the range. Alburay appeals the fifty-one-month sentence.

The district court also imposed three years of supervised release. At the sentencing hearing, the district court ordered a special condition of supervised release concerning deportation and re-entry into the United States. The text of the condition in the district court's written judgment, however, did not match up with what the district court had said on the record. Alburay appeals the discrepancy. Additionally, as mentioned above, the district court ordered $1,750,000 in restitution. Alburay also challenges that figure on appeal.

## II.

### A.

The basis of Alburay's sentencing challenge is *United States v. Booker*, 125 S. Ct. 738 (2005). Under *Booker*, the formerly mandatory federal sentencing guidelines have become advisory. *Id.* at 767. A sentence violates the Sixth Amendment, according to *Booker*, when it exceeds the maximum sentence authorized through the facts established by a jury verdict or a guilty plea or by facts otherwise admitted to by the defendant. *Id.* at 756. Here, Alburay's plea authorized the base offense level as well as the enhancement for more than minimal planning. As to the rest, they were imposed as the result of judge-found facts under mandatory guidelines. Alburay's sentence thus runs afoul of the Sixth Amendment, as interpreted by *Booker*, because, under the mandatory guidelines, the sentence exceeded the maximum sentence authorized by the facts established by the plea and Alburay's admissions and concessions. *Id.* Alburay, however, did not raise this Sixth Amendment argument before the district court. The matter is therefore governed by the

plain-error standard of review and our decision in *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005).

After oral argument in this appeal, we ordered a limited remand, pursuant to *Paladino*, to ascertain whether the Sixth Amendment error was prejudicial. *Id.* at 483-85. Specifically, under the *Paladino* procedure, we retained jurisdiction over the appeal while ordering "a limited remand to permit the sentencing judge to determine whether he would (if required to resentence) reimpose his original sentence." *Id.* at 484. In our limited remand order, we postponed adjudication of Alburay's supervised release and restitution arguments until we received the district court's *Paladino* answer.

On limited remand, the district court first ordered each party to submit a memorandum presenting their positions on the matter. After reviewing the memoranda and the record at the time of sentencing, the district court then issued a statement ruling that, if required to resentence, it would reimpose the original fifty-one-month sentence. Given the district court's decision, Alburay cannot show prejudice. *Id.* at 483-84. Nonetheless, the district court's decision does not end all appellate review of the sentence. As we held in *Paladino*: "If [the district court determines that it would reimpose the original sentence], we will affirm the original sentence against a plain-error challenge provided that the sentence is reasonable, the standard of appellate review prescribed by *Booker*." *Id.* at 484 (citing *Booker*, 125 S. Ct. at 765). Therefore, we now turn to reasonableness, the "final component of the *Paladino* plain error equation." *United States v. Mykytiuk*, ___ F.3d ___, No. 04-1196, 2005 WL 1592956, at *1 (7th Cir. July 7, 2005).

Pursuant to *Booker*, the reasonableness of a sentence is guided by the factors set forth in 18 U.S.C. § 3553(a). 125 S. Ct. at 765-66 ("Section 3553(a) . . . sets forth numerous

factors that guide sentencing. Those factors in turn will guide appellate courts . . . in determining whether a sentence is unreasonable."). Among other items, these factors include the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence to reflect the seriousness of the offense, the need to promote respect for the law, the need to provide just punishment for the offense, the need to afford adequate deterrence to criminal conduct, and the need to protect the public from further crimes of the defendant. 18 U.S.C. §§ 3553(a)(1) & (2)(A)-(C). Importantly, the relevant factors also include the now-advisory guidelines, which means that the guidelines "must" still be "consult[ed]" and "take[n] into account when sentencing." *Booker*, 125 S. Ct. at 767 (citing 18 U.S.C. §§ 3553(a)(4) & (5)); *see also United States v. George*, 403 F.3d 470, 472 (7th Cir. 2005). In the end, therefore, given the comprehensive scope of the guidelines, "[j]udges need not rehearse on the record all of the considerations that 18 U.S.C. § 3553(a) lists; it is enough to calculate the [guideline] range accurately and explain why (if the sentence lies outside it) this defendant deserves more or less." *George*, 403 F.3d at 472-73 (analogizing the current sentencing landscape to sentencing after supervised-release violations for which the guidelines have always been advisory and mandating the same approach, post-*Booker*, for the guidelines as a whole) (citing *United States v. Salinas*, 365 F.3d 582, 588-90 (7th Cir. 2004); *United States v. Hale*, 107 F.3d 526, 529-30 (7th Cir. 1997)); *see also Mykytiuk*, ___ F.3d ___, 2005 WL 1592956, at *1-2; *United States v. Dean*, ___ F.3d ___, No. 04-3172, 2005 WL 1592960, at *4-5 (7th Cir. July 7, 2005).

Here, in its limited remand statement, the district court first reviewed the § 3553(a) factors and then defended its multifaceted sentencing decision under the guidelines with this explanation:

> Defendant Alburay (1) committed numerous criminal acts and engaged in more than minimal planning in committing the offense, (2) possessed three social security numbers, two driver's licenses, and five aliases, (3) failed to appear for his sentencing hearing, and (4) was found with an alias when arrested after the issuance of a fugitive warrant. When coupled with his convictions and arrests not resolved by conviction or acquittal, these facts establish Defendant Alburay's gross disregard for the law and a pattern of recidivism. They also establish that Defendant Alburay went to great lengths to avoid detection of his criminal behavior. Based on the record at the time of sentencing and the Government's and Probation Office's recommendations, it was determined that Defendant Alburay's offense resulted in a loss amount of $1,750,000.00. This loss amount is significant and indicative of the serious nature of Defendant Alburay's offense. Finally, Defendant Alburay's criminal history grossly understates the likelihood that he will continue to commit financial crimes and otherwise disregard the law. In fact, the Court initially considered departing *upward* from the sentencing range proscribed by the guidelines before settling, instead, on its [original] sentence at the high end of the range. For all of these reasons, the Court declares that it would reimpose its [original] sentence if required to resentence Defendant Alburay. The fact that the sentencing guidelines are advisory does nothing to change this result.

The district court's limited remand decision presents a more than adequate justification of the sentence under the § 3553(a) factors. *See George*, 403 F.3d at 473. Here, moreover, we have a sentence within the guideline range, which was accurately calculated. *See id.* Alburay's only colorable

attack on the district court's guideline determination is the loss amount under § 2F1.1(b)(1)(M). However, as will be shown below, the $1,750,000 figure used by district court was accurate enough given that the range under § 2F1.1(b)(1)(M) is $1,500,000 to $2,500,000. For all of the above reasons, Alburay's fifty-one-month sentence is not unreasonable and is therefore affirmed under the plain-error analysis set forth in *Paladino*.

**B.**

Alburay also challenges a special condition of his supervised release pertaining to deportation and re-entry into the United States. At the sentencing hearing, the district court imposed the following special condition: "If deported, you are ordered not to re-enter the United States without the express written permission of the Attorney General of the United States." However, in the written judgment that followed, the district court expanded and altered the condition, stating: "Upon completion of his term of imprisonment, the defendant shall surrender to the immigration authorities for immediate deportation. As a further condition of supervised release, if deported, the defendant shall remain outside of the United States during his term of supervised release. If deported the defendant may not return to the United States without first obtaining the consent of the U.S. Attorney General."

Arguing that the written version of the condition is inconsistent with the oral version, Alburay seeks to have the written version replaced with the oral version. The government concedes the argument. The written version contradicts the oral version in that the oral version does not order "immediate deportation" in any shape or form. (The written version is also internally inconsistent: the conditional phrase

"if deported" does not square with the order for "immediate deportation.") The rule in such situations is clear: "If an inconsistency exists between an oral and the later written sentence, the sentence pronounced from the bench controls." *United States v. Bonanno*, 146 F.3d 502, 511 (7th Cir. 1998) (quoting *United States v. Becker*, 36 F.3d 708, 711 (7th Cir. 1994)). Further, as the oral version is unambiguous, there is no need to look beyond the oral version for any clarification from the written version. *See Bonanno*, 146 F.3d at 511-12 (quoting *United States v. Daddino*, 5 F.3d 262, 266 (7th Cir. 1993)). The written version is thus a nullity, not requiring further discussion. The cleanest way to end the matter is to remand with a corrective instruction. An additional hearing is not required. *See United States v. Maro*, 272 F.3d 817, 825 (7th Cir. 2001); *United States v. Parker*, 101 F.3d 527, 528 (7th Cir. 1996). Accordingly, the matter is remanded with following instruction: the district court shall enter a corrected judgment, deleting the current written special condition (quoted above) about deportation and re-entry in its entirety and replacing it with the exact language of the pertinent special condition (quoted above) announced from the bench.

## C.

Lastly, we turn to the district court's restitution award, which it derived from the government's loss calculations. To determine the USDA's loss caused by a food stamp scheme, the proper calculation is to take the total food stamp redemptions (i.e., both the fraudulent and legitimate redemptions) less the legitimate food stamp sales. *See United States v. Hassan*, 211 F.3d 380, 383 (7th Cir. 2000) (citing *United States v. Barnes*, 117 F.3d 328, 335 (7th Cir. 1997)). This formula's applicability to the present restitution matter is not in dispute.

For the redemption figure in its calculation, the government used the amount of $2,100,000 for the twenty-five months covering the duration of the scheme. The exact and undisputed redemption amount is $2,106,632.08, and Alburay has asked us to use that figure. However, while it is unclear why the government rounded the exact amount down to $2,100,000, the rounding actually benefitted Alburay by reducing his restitution obligation. In the afore-mentioned formula, a lower redemption figure will always yield a lower loss figure. Therefore, there is no need for us to take issue with the government's unexplained rounding of the redemption figure in this appeal.

Next, the government estimated legitimate sales by using the estimate that Alburay included on his 1996 application to join the food stamp program—$180,000 per year. Alburay disputes the use of that figure, but more on that point below. The government then put the two amounts in monthly terms. Thus, the government divided the $2,100,0000 figure by twenty-five months to arrive at a re-demption amount of $84,000 per month, and it divided the $180,000 figure by twelve months to arrive at a legitimate sales amount of $15,000 per month. It then determined the monthly loss figure to be $70,000, even though $84,000 per month in redemptions less $15,000 per month in legitimate sales produces a monthly loss figure of $69,000. The gov-ernment continues to cling to the $70,000 figure but offers no explanation for why it used $70,000 instead of $69,000. Finally, multiplying the $70,000 per month figure by twenty-five months, the government arrived at a loss total of $1,750,000.

The district court adopted the government's loss calcu-lations wholesale and ordered Alburay to pay $1,750,000 in restitution. The district court did so without objection from Alburay, who concedes that our review is thus limited to

plain error. *See United States v. Randle*, 324 F.3d 550, 555 (7th Cir. 2003). Even under this demanding standard, however, Alburay is entitled to some relief on account of the government's inaccurate loss calculation. *See United States v. Boyle*, 10 F.3d 485, 492 (7th Cir. 1993) ("The restitution amount must be ascertained and delineated with an accurate computation . . . . ") (citing *United States v. Lovett*, 811 F.2d 979, 990 (7th Cir. 1987)). The government has given us no reason to believe that its use of the $70,000 monthly figure, which yielded the $1,750,000 total figure, was anything other than an arithmetical error which increased the restitution amount. Plugging the government's numbers of $84,000 per month in redemptions and $15,000 per month in legitimate sales into the formula, the correct loss figure is $69,000 per month or $1,725,000 for the twenty-five-month period. Thus, the inflated $1,750,000 amount offered by the government and adopted by the district court is a plain error that prejudiced Alburay to the tune of $25,000. *See Randle*, 324 F.3d at 558 (several thousand-dollar plain error in restitution held to have affected defendant's substantial rights). While the erroneous amount is a tiny fraction of the total amount owed, it is nevertheless an error deserving of correction on remand. *See id.* There is, however, no need to acquire additional information or perform further analysis. Our computation above will suffice, and, thus, a new hearing before the district court is not required. *See Maro*, 272 F.3d at 825; *Parker*, 101 F.3d at 528. The matter is therefore remanded with the following instruction: the district court shall enter a corrected judgment, deleting the current $1,750,000 restitution amount and replacing it with the amount of $1,725,000 set forth above.

Before concluding, we briefly turn to Alburay's complaint about the $180,000 per year estimate for legitimate sales. The exact legitimate sales figure is unavailable; thus, an estimate

had to be used. Alburay suggests a number of alternative estimates based upon the sales of a handful of other stores in his area of Chicago from the relevant period. His alternatives would yield a lower restitution award, in the neighborhood of $1,300,000 to $1,500,000. The trouble with Alburay's argument, however, is there is little reason to believe that his suggested estimates from other selected stores are any more reliable than the $180,000 estimate that he used for Shady Food's USDA application. While the other stores are relatively close to Shady Food, they still operate at different locations, each having its own idiosyncrasies affecting sales, e.g., busy street versus side street. Likewise, while their markets certainly overlapped, the stores were of differing types, serving different segments of the marketplace, e.g., convenience store versus neighborhood corner grocery. Also, the sample size (i.e., number of stores in the estimates) is small.[2] Such matters certainly influence the reliability of a sales estimate. It is therefore difficult to say that the estimates based upon the other stores' figures are better, that is, more accurate, than Alburay's own estimate for Shady Food. After all, Alburay's application estimate pertains to the precise location and marketplace in question. He made his application estimate in 1996, after being in business for five months and shortly before he began perpetrating his fraud. Moreover, he included the $180,000 annual estimate on a federal form that he signed, swore to, and never sought to amend. Given these considerations, using the $180,000 figure in the restitution formula was not plainly erroneous.

---

[2] It is also likely that his sales were inflated when the word got out that food stamps could be exchanged for a discounted amount of cash. Assuming the other stores were not providing similar discounts, any comparison would be irrelevant.

### III.

As Alburay's fifty-one-month sentence for his food stamp scheme is not unreasonable, we AFFIRM the sentence. However, a special condition of Albuary's supervised release and the amount of the restitution award require correction. Nonetheless, a new hearing before the district court is not required. The case is REMANDED WITH INSTRUCTIONS for the district court to enter a corrected judgment with respect to the special condition at issue and the restitution award as stated above.

A true Copy:

       Teste:

                    _____

*Clerk of the United States Court of Appeals for the Seventh Circuit*