In the

# United States Court of Appeals

## For the Seventh Circuit

No. 06-3951

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MIR ALI,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02-CR-825-1—**Wayne R. Andersen,** *Judge.*

ARGUED DECEMBER 8, 2009—DECIDED AUGUST 27, 2010

Before EASTERBROOK, *Chief Judge,* and ROVNER and
TINDER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Mir Ali, and his business
partner, Mohammad Shah, ran a grocery store and a
food stamp scam that defrauded the United States De-
partment of Agriculture ("USDA") out of several million
dollars. They allowed food stamp recipients to exchange
food stamps for cash instead of food, a practice prohib-
ited by the food stamp program, *see* 7 U.S.C. § 2024, and

pocketed a portion of the proceeds. Ali pleaded guilty to
two counts of wire fraud, *see* 18 U.S.C. § 1343, and was
sentenced to 57 months' imprisonment. On appeal, he
challenges his plea, his sentence, and the district court's
orders of $4.9 million in restitution and $2.56 million
in forfeiture. We affirm the conviction and sentence
but remand with instructions to amend the restitution
award.

## I.

Congress created the food stamp program to allow low-
income households to receive a greater share of the na-
tion's food supply. 7 U.S.C. § 2011; *see Affum v. United
States*, 566 F.3d 1150, 1154 (D.C. Cir. 2009). Stores autho-
rized to participate in the program may accept food
stamps instead of cash for authorized food items and
then redeem those benefits with the government at face
value. *See* 7 U.S.C. § 2013(a). Illinois uses an electronic
card system known as LINK, similar to a debit card, to
process purchases with food stamps. *See id.* § 2016; *United
States v. Haddad*, 462 F.3d 783, 786 (7th Cir. 2006); *United
States v. Alhalabi*, 443 F.3d 605, 609 (7th Cir. 2006). The
LINK cards of qualified recipients are credited once a
month with benefits. *Haddad*, 462 F.3d at 786. When the
recipient uses the LINK card at a participating store to
obtain food, the store deducts the corresponding
benefits electronically with a specialized point-of-sale
machine and submits its total food stamp sales to the
USDA for reimbursement. *Id.*

Mir Ali, along with Mohammad Shah, owned and operated Star Foods, Inc., a small grocery store in Chicago. In 1996, Ali applied for Star Foods to participate in the food stamp program. On his application he estimated that Star Foods's annual food stamp-eligible sales would be $150,000 per year. He came to the attention of law enforcement after Star Foods's redemptions far exceeded this estimate. Star Foods redeemed benefits for over $640,000 in 1997. The next year, in which Star Foods redeemed over $910,000 in benefits, two undercover agents posed as food stamp recipients looking to exchange benefits for cash. They exchanged $231 and $230 in benefits for $150 in cash each. Star Foods's redemptions continued to escalate, amounting to over $964,000 in 1999, over $1 million in 2000, over $1.5 million in 2001, and over $1.8 million in 2002.

In 2005 Ali was charged with two counts of wire fraud stemming from the agents' undercover purchases. *See* 18 U.S.C. § 1343. (Shah was likewise indicted, but died shortly thereafter.) In the indictment, the government specified that Ali and Shah knowingly devised a scheme to defraud the USDA by exchanging LINK card benefits for cash. The government also sought forfeiture of almost $4.9 million acquired from the scheme, including a residence and two bank accounts. *See id.* § 981(a)(c); 28 U.S.C. § 2461. Ali pleaded guilty to both counts without a plea agreement, but sought a bench trial on the forfeiture allegation.

At the plea hearing, the government described each of the charges in the indictment and summarized the evi-

dence in support. After prompting from the court, the government explained that each count carried a potential penalty of 20 years' imprisonment, a $250,000 fine, and 3-5 years' supervised release. The total potential imprisonment, the government continued, would be 40 years because the sentences could run consecutively. Ali stated he understood that those were his potential penalties and said that he was pleading guilty because he committed the crimes. His counsel then asked whether the government would object to a 3-level adjustment for accepting responsibility. *See* U.S.S.G. § 3E1.1. The government stated it would not provided that Ali was eligible. The court accepted the plea.

The district court then held a bench trial on the forfeiture allegation. The government stated it would use the forfeiture proceeding to prove both the forfeiture amount and, for purposes of sentencing and restitution, the loss to the USDA. The government began by asserting that Ali should forfeit $4,950,992.80, the alleged proceeds of his wire fraud scheme, and pay restitution in a like amount to the USDA. Ali countered that the loss was only $461, the sum of the two undercover sales. In the course of the forfeiture hearing, the government reduced the forfeiture amount to $2,567,587.05 because the statute allowing for forfeiture had not become effective until August 2000, two-and-a-half years after Ali's scheme began. The government also revised the loss amount for restitution to $4,290,000.

The principal witness at the forfeiture proceeding was Mireille Swain, a special agent with the USDA, who

testified to the existence and extent of the fraud. She began by explaining that Star Foods had not bought sufficient inventory to justify its redemptions. She compiled a comprehensive list of Star Foods's monthly redemptions since 1997 to August 2002 and noted that the monthly redemptions significantly exceeded Ali's estimate every year. And, Star Foods's redemptions also exceeded the redemptions of even much larger local stores. Based on Star Foods's bank accounts, it had deposited $7,159,838 during the scheme, with more than 98% of these deposits consisting of electronic food stamp redemptions.

She then compared Star Foods's sizable deposits to its purchased food and non-liquor stock, which she assumed were all food stamp-eligible items. Relying exclusively on Ali's own business records, Swain determined that, although Star Foods deposited over $7 million, Star Foods wrote checks totaling only $1,829,290.39 to buy food and non-liquor stock. Some purchases likely included non-food stock, but because she assumed that all purchases were food stamp-eligible purchases, this increased the amount of sales Ali could justify. So, any discrepancy favored Ali. She also concluded that Star Foods spent only $1.8 million on food and non-liquor stock because she could not find any evidence that Star Foods made purchases in any other form, i.e., with cash. To this end, she reviewed sixteen months' of bank reconciliations that categorized purchases, but no category accounted for purchases made with cash, and each had a reference number that Swain determined corresponded to a check

number. She also spot-checked the daily expense folders seized from Ali's business and similarly found that each invoice had a corresponding check. Thus, she concluded that Ali spent $1,829,290.39 on food and non-liquor stock.

Swain then estimated that the retail value of the food and non-liquor stock was approximately $2.7 million. To arrive at this figure, she applied a 50% markup (what Swain estimated was the general retail markup for grocery items) to the amount Star Foods spent on food and non-liquor inventory. She then assumed that *all* these sales were made with food stamps (another assumption that favored Ali). Thus, she concluded, Ali could justify $2.7 million in food stamp redemptions. So Swain deducted this amount from the total food stamps redeemed (approximately $7 million) and opined that $4.29 million was not justified by Ali's food and non-liquor stock purchases. This unjustified amount, she concluded, was the total loss to the USDA and the proceeds of Ali's criminal scheme.

Finally, to calculate the forfeiture amount, Swain considered only Star Foods's redemptions and sales after the forfeiture law was effective. She found that, after the law's effective date, Ali redeemed $3,822,432.97 in food stamps but had only $836,563.35 in food and non-liquor stock purchases. After applying the 50% markup ($1,254,845.02), Swain concluded that approximately $2.56 million was not justified by Ali's food stock purchases. Ali offered no evidence to refute the government's loss or forfeiture calculations.

After the hearing, the government inexplicably reverted to its original $4,950,992 figure for restitution when it gave the probation officer its official version of Ali's offense conduct, which the probation officer accepted without comment. The presentence investigation report also recommended that Ali not receive the adjustment for accepting responsibility because Ali told the probation officer that he was innocent and pleaded guilty just to get rid of the case. At the sentencing hearing, the district court invited Ali to respond to whether he should get the adjustment. Ali minimized his conduct and said he was merely following Shah's instructions. He further insisted that he and Shah had not properly recorded cash purchases for food and non-liquor stock, so the government had understated his inventory and overstated the loss to the USDA. Ali also asserted that his was not the only store that gave cash for benefits. After hearing Ali's statements, the district concluded that he had not accepted responsibility and would not receive the adjustment. The district court also acknowledged Ali's objection to the government's loss figures but accepted the probation officer's $4,950,992 recommendation. The court then calculated Ali's imprisonment range: his offense warranted a base offense level of 7 with an added 18 points for a loss between $2.5 million and $5 million, *see* U.S.S.G. § 2B1.1(a), (b)(1)(J), and when combined with his criminal history category I yielded a guidelines range of 57-71 months' imprisonment. The court ordered Ali to pay restitution of $4,900,000, to forfeit $2,560,000, and sentenced him to 57 months' imprisonment and 3 years' supervised release.

**II.**

Ali appealed, and his lawyer filed a motion to withdraw under *Anders v. California,* 386 U.S. 738 (1967), contending that Ali had no non-frivolous issue to raise on appeal. But we denied counsel's motion and observed that an argument premised on the discrepancy between the $4.29 million that the government proved for restitution and $4.9 million that the district court ordered would not be frivolous. Counsel raises a host of other issues on appeal but ignores the one argument about restitution that we considered non-frivolous. Ali now attacks the voluntariness of his plea, the denial of the adjustment for acceptance of responsibility, the reliability of the government's loss calculation, and the accuracy of certain statements the government made at oral argument. We address each in turn.

**A.**

Ali first argues that he did not knowingly and intelligently plead guilty. Because Ali did not move to withdraw his guilty plea in the district court, we review for plain error only. *See* FED. R. CRIM. P. 52(b); *Puckett v. United States*, 129 S. Ct. 1423, 1429 (2009); *United States v. Anderson*, 604 F.3d 997, 1001 (7th Cir. 2010). Under plain error review, we must find that an error affected Ali's substantial rights and seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *See United States v. Marcus*, 130 S. Ct. 2159, 2164 (2010); *United States v. Polak*, 573 F.3d 428, 431 (7th Cir.), *cert. denied,* 130 S. Ct. 654 (2009). Ali contends that

during the plea colloquy, the district court failed to ensure that he knew the elements of wire fraud. A defendant does not enter a plea voluntarily and knowingly if he pleads guilty to a crime without knowledge of the crime's essential elements. *Bradshaw v. Stumpf*, 545 U.S. 175, 182-83 (2005); *United States v. Davey*, 550 F.3d 653, 656 (7th Cir. 2008). But the record does not support Ali's argument. The court asked the government to explain the charges, and the government stated that the two charges of wire fraud involved an intentional plan to defraud the USDA's food stamp program by electronic means. And to convict a defendant of wire fraud, the government was required to show just that: an intentional scheme to defraud that uses wires in furtherance of that scheme. *See, e.g., United States v. McGowan*, 590 F.3d 446, 457 (7th Cir. 2009); *United States v. Leahy*, 464 F.3d 773, 786 (7th Cir. 2006).

Ali next contends that the admonitions he received during the plea colloquy about his possible sentence were inadequate. *See* FED. R. CRIM. P. 11(b)(1)(H). Specifically, he claims that the government led him to believe that he would receive a lower sentence for acceptance of responsibility. *See* U.S.S.G. § 3E1.1(a)-(b). But the government was clear on whether Ali would receive that reduction: it would not object to an adjustment under § 3E1.1 provided that Ali was eligible, and the district court found he was not. The government never stipulated that Ali was eligible for the adjustment. Moreover, during the colloquy, the government warned that the potential term of imprisonment was 40 years, and Ali received just 57 months' imprisonment, well below the

total that he was warned about. Thus, Ali has not shown that the government's statement about his sentence exposure affected any substantial right. *See United States v. Parker*, 368 F.3d 963, 968-69 (7th Cir. 2004).

**B.**

Ali next contends that the district court erroneously denied him the adjustment for acceptance of responsibility. *See* U.S.S.G. § 3E1.1. We review the district court's ruling for clear error. *See, e.g., United States v. DeLeon*, 603 F.3d 397, 406 (7th Cir. 2010); *United States v. Panice*, 598 F.3d 426, 435 (7th Cir. 2010). Ali maintains that the district court should have held a hearing on the matter, rather than just relying on the PSR's factual finding that Ali stated he was innocent and pleaded guilty to get rid of the case. But Ali did not dispute these factual findings at sentencing and a district court may accept any undisputed portion of the PSR as a finding of fact. *See* FED. R. CRIM. P. 32(i)(3)(A); *United States v. Heckel*, 570 F.3d 791, 795-96 (7th Cir. 2009).

In any event, Ali *did* have a hearing during which the court considered acceptance of responsibility. At the sentencing hearing the district court invited comments from the government, Ali's counsel, and Ali himself on this very issue. Ali spoke at length as to why he was entitled to the § 3E1.1 adjustment. But as the district court found, Ali's testimony supported the recommendation in the PSR. Ali showed no contrition or remorse. Instead, he tried to minimize his conduct by claiming that

Shah set up the fraud scheme and that Ali unwittingly followed instructions. But blaming someone else for one's own actions or minimizing one's involvement in the offense is not the sort of genuine contrition the acceptance of responsibility reduction seeks to reward. *See United States v. Munoz*, 610 F.3d 989, 993 (7th Cir. 2010); *DeLeon*, 603 F.3d at 408. The purpose of § 3E1.1 is not just to induce guilty pleas, but to identify defendants who have demonstrated sincere remorse for their crime and are thereby less likely to delay justice or engage in further criminal activity when they complete their sentence. *United States v. Wells*, 154 F.3d 412, 413 (7th Cir. 1998). Thus, even though his guilty plea reflects some measure of acceptance of responsibility, the plea alone does not entitle him to a reduction under § 3E1.1. *See* U.S.S.G. § 3E1.1 cmt. n.3; *Munoz*, 610 F.3d at 993; *Panice*, 598 F.3d at 435. We therefore do not think the district court's conclusion that Ali had not accepted responsibility was clear error.

## C.

Ali also attacks the restitution award, the forfeiture order, and the loss amount used for sentencing. The government was required to prove by a preponderance of the evidence the loss amount for both forfeiture and sentencing. *See United States v. Melendez*, 401 F.3d 851, 856 (7th Cir. 2005); *United States v. Vera*, 278 F.3d 672, 673 (7th Cir. 2002); *United States v. Jarrett*, 133 F.3d 519, 530 (7th Cir. 1998). The calculation of this amount is a

factual determination that we review for clear error. *See United States v. Sutton*, 582 F.3d 781, 783-84 (7th Cir. 2009); *United States v. Oros*, 578 F.3d 703, 711 (7th Cir. 2009); *United States v. Swanson*, 394 F.3d 520, 528 (7th Cir. 2005); *United States v. Baker*, 227 F.3d 955, 967 (7th Cir. 2000); *Jarrett*, 133 F.3d at 530. Criminal forfeiture is available generally for convictions of mail and wire fraud, and not merely for those special cases that injure financial institutions. *See United States v. Day*, 524 F.3d 1361, 1376 (D.C. Cir. 2008); *United States v. Schlesinger*, 514 F.3d 277, 278 (2d Cir. 2008); *see also United States v. Venturella*, 585 F.3d 1013, 1016 (7th Cir. 2009), *cert. denied,* 130 S. Ct. 1547 (2010); *United States v. Silvious*, 512 F.3d 364, 369 (7th Cir. 2008).

In essence, Ali's challenges to the loss calculation, forfeiture order, and restitution award are the same. He disputes the reliability of the government's evidence used to establish the loss to the USDA. Thus, we analyze these challenges together. Sentencing judges are not bound by the stringent evidentiary standards applicable at trial; rather, the evidence need only be reliable. *E.g., United States v. Angle*, 598 F.3d 352, 357 (7th Cir. 2010); *United States v. Mays*, 593 F.3d 603, 608 (7th Cir.), *cert. denied,* 130 S. Ct. 3340 (2010).

First, Ali argues that the loss should be measured by the gain to Ali personally, and thus the government was required to call as witnesses the cash recipients to determine the amount that Ali pocketed. He did not make this argument at the forfeiture proceeding. Arguments not raised below are forfeited and thus reviewed for

clear error only. *See, e.g., United States v. Alviar*, 573 F.3d 526, 538 (7th Cir. 2009), *cert. denied,* 130 S. Ct. 1312 (2010); *United States v. Middlebrook*, 553 F.3d 572, 577 (7th Cir. 2009). The government's position was that the dollar value of food stamps that were not spent on eligible food items but exchanged for cash, were the proceeds—the gain—of the offense, and were likewise subject to forfeiture. *See United States v. Uddin,* 551 F.3d 176, 181 (2d Cir.), *cert. denied,* 129 S. Ct. 2886 (2009); *United States v. Hassan,* 211 F.3d 380, 384 (7th Cir. 2000)*; United States v. Barnes,* 117 F.3d 328, 335 (7th Cir. 1997); *United States v. Lewis,* 104 F.3d 690, 692-93 (5th Cir. 1996). According to the government, therefore, the loss was the entire amount that Ali received in illegitimate redemptions, regardless of whether he shared the cash he received from the government with a food stamp beneficiary. And we have recognized before that "[t]o determine the USDA's loss caused by a food stamp scheme, the proper calculation is to take the total food stamp redemptions (i.e., both the fraudulent and legitimate redemptions) less the legitimate food stamp sales." *United States v. Alburay,* 415 F.3d 782, 788 (7th Cir. 2005); *see also Haddad,* 462 F.3d at 793; *Hassan,* 211 F.3d at 383; *United States v. Brown,* 136 F.3d 1176, 1183 (7th Cir. 1998), *superseded by,* U.S.S.G. § 3B1.2, cmt. n.3(A)*, as recognized in United States v. Rodriguez-Cardenas*, 362 F.3d 958, 960 (7th Cir. 2004); *Barnes,* 117 F.3d at 334-35. And that is what Agent Swain did here: she determined Star Foods's total food stamp redemptions (approximately $7 million) and deducted legitimate food stamp sales (approximately $2.7 million) to arrive at the loss figure of approximately $4.29 million. She

estimated Star Foods's legitimate sales by assuming *all* inventory purchases were legitimately exchanged for food stamp-eligible items. And to determine Ali's purchases, she relied upon Ali's own business records, bank accounts, invoices, and financial statements. By assuming that *all* purchases (including a 50% markup) were then exchanged for food stamp-eligible items, Swain interpreted the records and the data in a way that favored Ali. On this record, we cannot say that the district court's factual findings supporting the forfeiture award were clearly erroneous. *See Haddad,* 462 F.3d at 793-94 (upholding loss calculation under similar circumstances); *Hassan,* 211 F.3d at 383-84 (same); *United States v. Bahhur*, 200 F.3d 917, 924-25 (6th Cir. 2000) (same); *United States v. Cheng,* 96 F.3d 654, 657-58 (2d Cir. 1996) (same).

Ali next argues that Agent Swain's testimony was unreliable (and thus the court's conclusion about the loss was clear error) because the agent failed to recognize that some bank deposits came from legitimate sales and not redemptions. But Ali is incorrect. Agent Swain testified that almost 98% of the bank deposits in Star Foods's account consisted of electronic food stamp redemptions, and the government removed from its loss calculation the 2% of deposits unrelated to food stamp redemptions from its calculation. Ali also complains that Swain failed to account for Star Foods's cash purchases for food and non-liquor stock, thereby overstating the loss. Ali speculates that Swain spot-checked too few of his daily expense folders and had she examined more she would have discovered cash purchases. But Swain reviewed Ali's and Star Foods's records for

about a 4-year period to hunt for any evidence to support Ali's claim that he bought inventory with cash; she found none. The sentencing court credited Swain's testimony, a finding that we accord deference, *see United States v. Ngatia*, 477 F.3d 496, 500 (7th Cir. 2007). And Ali offered nothing to rebut Swain's conclusion of no cash purchases. Thus, the district court's conclusion was not clearly erroneous. *See Alburay*, 415 F.3d at 790 (holding district court's loss calculation not plain error when government determined loss for food stamp fraud by relying on defendant's own estimates and business documents); *Hassan*, 211 F.3d at 384 (upholding district court's loss calculation when, after government established loss by deducting legitimate business from amount of redemptions, district court provided defendant an opportunity to rebut the government's evidence and establish transactions were legitimate, but he did not do so).

Finally, Ali makes a puzzling argument, contending that Swain failed to account for spoilage and theft in her loss calculations. But this "failure" would work against him. Swain assumed that *all* Star Foods's inventory purchases led to legitimate food stamp sales and then were legitimately redeemed. Had Swain assumed that some purchased inventory spoiled or was stolen (or not legitimately redeemed), Ali would be able to justify *fewer* of his redemptions and the loss amount would be greater. We do not see how the more favorable assumption to Ali constitutes clear error. *See Alburay*, 415 F.3d at 788 (stating court would not take issue with government's

rounding redemption figure down when it benefitted defendant).

Nevertheless, we note a problem with the restitution order. The government concedes that the total loss proven at the forfeiture proceeding was only $4,290,000 but the district court ordered Ali to pay about $4,900,000 in restitution. The government recognized this error and moved in the district court to amend the restitution order. The district court did so but Ali had already filed a notice of appeal. "The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982); *see United States v. Burton*, 543 F.3d 950, 952 (7th Cir. 2008); *United States v. McHugh*, 528 F.3d 538, 540 (7th Cir. 2008). At argument the government recognized this problem as well and asked to remand. We agree with the government that a corrective remand is in order. Accordingly, we remand the case, instructing the district court to correct the restitution award to reflect that the amount proven at the forfeiture proceeding was $4,290,000. *See Alburay*, 415 F.3d at 788.

## D.

Ali frames his final issue as a motion seeking remand for an evidentiary hearing. He argues that at oral argument the government misrepresented that certain business records were available to Ali before the forfeiture proceeding. He contends that the prosecutor

never delivered these business records, seized from his store, but he acknowledges (and the record and the documents he submits with his motion verify) that his counsel and Ali himself had access to the records before the forfeiture proceeding. Thus, we have no reason to believe that the sentencing judge did not have the opportunity to hear this evidence. *See United States v. Neal*, No. 08-3611, 2010 WL 2652463, at *2 (7th Cir. July 6, 2010). His motion is denied.

## III.

Accordingly, we DENY Ali's motion to remand for an evidentiary hearing, AFFIRM IN PART, and REMAND WITH INSTRUCTIONS for the district court to correct the judgment to reflect that the restitution award is $4,290,000.