In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3006

WILLIAM R. KERR,

*Petitioner-Appellant,*

*v.*

MICHAEL A. DITTMANN,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 04-C-1153 — **Charles N. Clevert, Jr.**, *Judge.*

ARGUED OCTOBER 29, 2013 — DECIDED MARCH 5, 2014

Before WOOD, *Chief Judge*, and KANNE and HAMILTON, *Circuit Judges*.

WOOD, *Chief Judge*. The last time William Kerr was before this court on appeal from the denial of his petition under 28 U.S.C. § 2254 for relief from his conviction for murdering his wife's lover, we found that he was entitled to an evidentiary hearing on issues surrounding an alleged plea offer from the state. See *Kerr v. Thurmer*, 639 F.3d 315 (7th Cir. 2011). Before that hearing could take place, the Supreme Court vacated

our judgment and remanded for reconsideration in light of
*Lafler v. Cooper,* 132 S. Ct. 1376 (2012). See *Thurmer v. Kerr*, 132
S. Ct. 1791 (2012); see also *Kerr v. Dittmann*, 468 F. App'x 636
(7th Cir. 2012). After conducting the necessary proceedings,
the district court found that the state never offered a plea
bargain to Kerr, and so it again denied Kerr's petition. He
has now appealed, but we find no error (clear or otherwise)
in the district court's finding. We therefore affirm.

**I**

Readers of our first opinion will recall that Kerr shot his
victim at point-blank range after the lover came to Kerr's
house for a showdown over the wife's affections. Afterwards
Kerr turned himself in, and a jury ultimately convicted him
of first degree intentional homicide; the judge sentenced him
to life in prison, with eligibility for parole after 21 years. His
petition for a writ of *habeas corpus*, however, concerns what
happened (or did not) before the trial began. Kerr alleges
that the prosecutor, assistant district attorney Mark Wil-
liams, offered a plea agreement under which Kerr would
plead guilty to first degree reckless homicide, a Class B felo-
ny. According to Kerr, while his attorney Gerald Boyle cor-
rectly told him what the offer was for, Boyle failed to advise
him correctly about the penalties he would face if he accept-
ed it. Specifically, Kerr alleges that Boyle told him that first
degree reckless homicide in Wisconsin carries with it a sen-
tence of life imprisonment with parole eligibility beginning
at 13 years (the same range as first degree intentional homi-
cide). Kerr says that he rejected this alleged offer because the
sentencing range was the same as the one for intentional
homicide (which he was about to be tried on), and thus it
was not much of a deal. When this case was before us previ-

ously, we held that Kerr was entitled to an evidentiary hearing on the issue of the alleged offer of a plea bargain, and we remanded for that purpose.

## II

At the evidentiary hearing, the district court heard from four witnesses: Kerr, Williams, Boyle, and Boyle's co-counsel, his daughter Bridget Boyle (Bridget). The evidence was mixed. On the one hand, both Boyle and Williams testified that there was no offer at all. On the other hand, supporting Kerr, was his own testimony, some of Bridget's statements, and letters between Bridget and Kerr since his incarceration. The most contested piece of evidence came from a sealed transcript that was created after Kerr's sentencing. We begin with a summary of what that transcript recounted.

A few nights before Kerr's sentencing, Bridget visited him in prison. During that meeting, Kerr made several accusations against the Boyles. Upon hearing about them, Boyle asked to discuss the conflict in the judge's chambers; it is this discussion that was part of the sealed transcript.

One of Kerr's accusations was that Boyle never brought to his attention an alleged offer of a plea bargain from Williams. Boyle responded with both a letter and personal visit, at which point (according to Boyle) Kerr apologized. In recounting this to the judge, Boyle speculated that Kerr's complaints stemmed from the influence of a jailhouse lawyer. Hearing this, the judge asked Boyle if he would like Kerr to be brought back into chambers to state on the record that he recanted his prior charges. The judge said that he asked because once Kerr was back in prison, the chance that another

jailhouse lawyer might make a similar suggestion was good. Boyle agreed to have Kerr returned to chambers.

It was then that the disputed statement was made. Boyle began by summarizing his recollection of the pretrial discussions for Kerr. He remembered that Kerr had told Boyle to forget his accusations and to continue helping him with his case. With regard to the alleged offer, Boyle said to Kerr "you now understand that we really had no offer other than the possibility of your pleading to life imprisonment with a 13—with a statutory minimum. And when I brought that to you, I told you if there was any possibility at all, that was it. And you told me you would not do that." The judge then asked Kerr if he agreed with what Boyle said and Kerr responded that he did. To reconfirm, the judge asked Kerr, "And [Boyle] didn't fail to convey any potential negotiations to resolve the case short of trial?" to which Kerr responded "No." Williams was in the room throughout this conversation and said nothing.

At the evidentiary hearing, which obviously occurred years after the sealed transcript had been created, Boyle stated that while he could not remember the specifics of his discussions with Williams, he did recall that the state did not extend a formal offer that he could take back to Kerr. Boyle also testified that he talked to Kerr about the possibility of pleading guilty to the first degree intentional homicide charge and then trying to convince the state to agree to a 13-year parole eligibility date. But, Boyle recounted, Kerr would not agree to such a deal.

Like Boyle, Williams testified that there was never an offer. While he had a vague memory of Boyle's asking him what could happen in the case, he testified that he did not

recall anything specific. Williams also testified that in 95 percent of his cases where he offers a plea bargain, the offer is in writing. In this instance, everyone agreed that there was no written agreement, nor were there any notes in his file indicating that he spoke to Boyle about a plea deal. While Williams had difficulty remembering all of the specifics, he stated that at the time of trial he was adamant about trying the case, and that the victim's family had been particularly insistent on its going forward as a first-degree intentional case. And, while he had overridden victim-family wishes in the past, he saw no reason to amend the first-degree intentional charge here. He commented that he had never offered a plea bargain in a case like this, where an unarmed man was sitting at a table and then was blasted with a shotgun.

Williams was also asked whether he remembered the conversation that was recounted in the sealed transcript. While he said that he could not recall the conversation, he thought after reading it that perhaps he told Boyle to see whether Kerr would simply plead guilty to first-degree intentional homicide. He reiterated, however, that he did not have a clear recollection either way.

In contrast to Boyle's and Williams's testimony, which supported the conclusion that there was no offer, the judge was also presented with a number of letters written by Bridget to Kerr while the latter was in prison. Those letters contain several references to a possible offer.

Before Kerr filed his post-conviction state petition, he wrote to the Boyles about his case and the purported offer for first-degree reckless homicide. In a June 21, 2002, response, Bridget wrote, "I recall that there was an offer made to us on the day of trial. … It is my further recollection that

you declined to accept the offer." In response to a 2005 letter from Kerr to Boyle, Bridget again responded on her father's behalf, stating that she "ha[d] the knowledge to answer the questions" Kerr had about the alleged offer. She again reconfirmed that Williams made an offer on the morning of trial but stated to Kerr, "You are well aware that both my father and I had a lengthy conversation with you after receiving that offer. You determined that you did not want that offer and proceeded to trial."

Bridget also gave oral testimony at the evidentiary hearing—testimony that contradicted some of the points she had made in the letters. She testified that instead of there being a formal offer, she recalled only that Williams was talking about the possibility of a guilty plea to second-degree intentional homicide. That said, she also stated that while the offer was only informal, she believed that if Kerr had been interested, the offer would have been formalized. Not only did Bridget not mention reckless homicide (the charge Kerr said he was offered), but she also backtracked from the position that there was ever a formal offer at all. Bridget conceded that while she recalled the discussions centering on second-degree intentional homicide, once she saw her father's statements in the sealed transcript, she was confused. Her confusion arose because in the sealed transcript her father stated that if there was any offer it would have been life with 13 years parole eligibility, which was not the sentencing range for second-degree intentional homicide.

Kerr's testimony was in stark contradiction to that of Boyle and Williams. According to Kerr, right before the jurors came up, he, Boyle, and Bridget went into a small holding cell where the Boyles told him that Williams had made

him an offer that involved his pleading guilty to first-degree reckless homicide. That charge, Boyle supposedly told him, carried with it a minimum of 13 years, 4 months, and a maximum of life without parole. Kerr testified that he turned down the deal because he figured the sentence he faced was not materially different from the one he was already facing on the charge of first-degree intentional homicide.

After hearing all of this testimony and reviewing the documentary record, the district court found that Williams never made an offer to Kerr. While there were discussions about a possible guilty plea, the court found nothing to indicate that Williams was prepared to accept a plea to a Class B felony—the arrangement that Kerr believed he heard Boyle communicate. Instead, the court thought it possible that Boyle went to Williams and tried to suggest some kind of pre-trial resolution, and Williams then told Boyle to get back to him after he figured out what Kerr was willing to do. Thus, even though there was some communication between Kerr and Boyle about a plea, no firm offer was ever extended.

In reaching this conclusion, the district court began by stating that in its view none of the statements made by the Boyles supported Kerr's assertion that the state offered to allow him to plead guilty to first-degree reckless homicide. Indeed, crediting Williams's testimony, the court found that there was no offer at all. It noted Williams's estimate that in about 95 percent of his cases where there is an offer, he reduces the offer to writing, yet here there was no written agreement. There were no notes in his file concerning an offer. Williams's explanation for why he would not accept a guilty plea to second-degree intentional homicide in a case

like this was persuasive. In fact, Williams was adamant about trying this case, which he considered cold-blooded murder. The court dismissed Bridget's letters to Kerr as having been written without properly familiarizing herself with the case. (The evidence indicated that she wrote them without even opening his file.) If anything, the court thought, she was compounding any misunderstandings that previously existed.

**III**

When a district court denies *habeas corpus* relief, we review that court's findings of fact for clear error. *Rittenhouse v. Battles*, 263 F.3d 689, 695 (7th Cir. 2001). The question whether there was or was not an offer of a plea bargain is a quintessential question of fact: what happened? Given the conflicting evidence before the district court, we see no clear error in the determination that the assistant district attorney never made an offer.

First, while Kerr argues that Boyle's statement in the sealed transcript definitively shows that there was an offer, that is not the case. Even if that evidence strongly pointed to an offer, there was conflicting evidence on the other side, and the court chose to credit the latter evidence. In addition, all Boyle said was, "you now understand that we really had no offer other than of your pleading to life imprisonment with a 13—with a statutory minimum. And when I brought that to you, I told you if there was any possibility at all, that was it. And you told me you would not do that." One could reasonably understand Boyle to be stating that there never was an offer, but only the possibility of Kerr's pleading guilty to the charge of first-degree intentional and hoping for a favorable recommendation on parole eligibility. Kerr's

counsel's inquiry about Kerr's interest in pleading guilty to the first-degree intentional-homicide charge is not itself an offer.

Second, while Bridget's letters could support a finding that there was some kind of offer, it was within the district court's discretion to discount those letters and her testimony more generally. The district court thought that Bridget was careless when she responded to Kerr without first taking the time to open his file. Whether she would have uncovered helpful information in his file is beside the point—the district court was entitled to find that a person who responds to a client about such serious topics without first consulting that client's file is not a particularly credible witness. Reasonable minds could differ about whether that is the best conclusion to come to regarding Bridget, but we cannot say the district court's conclusion was erroneous.

Even though Bridget testified that she believed Kerr could have pleaded guilty to second-degree intentional homicide, that is a different deal from the one Kerr remembers and the one Bridget originally seemed to endorse in her letters to Kerr. A reasonable person could interpret this discrepancy two ways: either it meant that there was an offer but Bridget was confused about the specifics, or it meant (as the district court found) that she was not well-informed and thus her testimony was unhelpful.

Relying on Rule 602 of the Federal Rules of Evidence, Kerr also argues that because Boyle and Williams could not remember all the specifics of the events in question, the district court erred in relying on their testimony at all. Kerr did not, however, make this argument in the district court, and so we will review it only for plain error. See *United States v.*

*Ali*, 619 F.3d 713, 720 (7th Cir. 2010). Even under a more gen-
erous standard of review, the argument goes nowhere. A
reasonable trier of fact could believe that Williams and Boyle
had personal knowledge of the facts about which they testi-
fied. See *United States v. Joy*, 192 F.3d 761, 767 (7th Cir. 1999).
Boyle testified that it was clear to him that he was not going
to get a plea deal for Kerr. When asked why he held that be-
lief, Boyle responded that Williams did not offer him any-
thing and he knew that no offer was forthcoming. Pushed
again to explain whether he specifically recalled conversing
with Williams, he responded, "No, I know what happened.
When it happened? What words he used? I don't know."
Boyle was testifying about events that happened more than
12 years earlier; the district court was probably unsurprised
that he did not remember all the specifics. But what he testi-
fied to was a fact that he did remember clearly: there was no
offer.

Finally there was Williams's testimony, on which the dis-
trict court relied most heavily. As we have already noted,
Williams recalled the critical details about his trial strategy.
The fact that he could not remember either the exact words
that he spoke to Boyle or the conversation recorded in the
sealed transcript does not matter. Williams unequivocally
testified that there was no offer. He remembered a variety of
reasons why this was the case, and he informed the court
about his usual practice. That was all relevant information,
and Williams was in a position to testify about it.

We do not mean to suggest that the district court came to
the only possible conclusion on these facts. There is enough
evidence in the record that a fact-finder could have come out
either way. But whether we agree with the district court's

factual conclusion is not the question. There was conflicting evidence and the district court had to make a finding; it did so, and its finding is not clearly erroneous.

**********

Sufficient evidence supports the district court's finding that Kerr never received an offer for a plea bargain. We therefore AFFIRM the judgment of the district court denying Kerr's petition for a writ of *habeas corpus*.